**SINALTRAINAL, the Estate of Isidro Segundo Gil, Plaintiffs,**

v.

**THE COCA–COLA COMPANY, et al., Defendants.**

**Sinaltrainal, Jorge Humberto Leal Plaintiffs,**

v.

**The Coca–Cola Company, et al., Defendants.**

**Sinaltrainal, Juan Carlos Galvis, Plaintiffs,**

v.

**The Coca–Cola Company, et al., Defendants.**

**Sinaltrainal, Luis Eduardo Garcia, Alvaro Gonzalez, and Jose Domingo Flores, Plaintiffs,**

v.

**The Coca–Cola Company, et al., Defendants.**

Nos. 01–3208–CIV–MARTINEZ, 02–20258–CIV–DUBE, 02–20260–CIV–MARTINE, 01–3208–CIV–DUBE, 02–20259–CIV–MARTINE, 02–20260–CIV–DUBE, 02–20258–CIV–MARTINE, 02–20259–CIV–DUBE.

United States District Court, S.D. Florida.

March 28, 2003.

Mark Howard Richard, Osnat Kate Rind, Phillips Richard & Rind, Miami, Daniel M. Kovalik, United Steel Workers of America, Pittsburgh, PA, Natacha H. Thys, Terry Collingsworth, International Labor Rights Fund, Washington, DC, for Sinaltrainal, Isidro Segundo Gil, The es-

tate of, Luis Eduardo Garcia, Alvaro Gonzalez Lopez, Jose Domingo Flores, Jorge Humberto Leal, Juan Carlos Galvis, plaintiffs.

Rima Youakim Mullins, Kirkpatrick & Lockhart, Marcos Daniel Jimenez, White & Case, Angel Castillo, Jr., Robert Mark Brochin, Christina T. Ng, Morgan Lewis & Bockius, James Edward McDonald, William Power McCaughan, Duane Morris, Miami, for Coca–Cola Company, the, Coca–Cola de Colombia, S.A., Panamerican Beverages Company L.L.C., Panamco, L.L.C., Panamco Industrail de Gaseosas, S.A. aka Panamco Colombia, S.A., Richard I. Kirby, Richard Kirby Kielland, Bebidas Y Alimentos de Uraba, S.A., defendants.

### *ORDER ON MOTIONS TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION* [1]

MARTINEZ, District Judge.

THIS MATTER is before the court upon Defendants' Joint Motion to Dismiss for First Amended Complaint for Lack of Subject Matter Jurisdiction. Defendants', on October 9, 2001, filed a Joint Motion to Dismiss for Lack of Subject Matter Jurisdiction [DE# 35] filed on October 9, 2001. On December 10, 2001, Panamerican Beverages, Inc. sought to join in the aforementioned motion to dismiss [DE# 45]. On January 22, 2002, Plaintiffs amended the complaint [DE# 48] and Defendants moved to dismiss the amended complaint on March 5, 2002 [DE# 53]. For the reasons set forth in this memorandum, this Court will GRANT in part Defendants' Joint Motion to Dismiss for First Amended Complaint for Lack of Subject Matter Jurisdiction.

---

**1.** As each of the aforementioned cases filed identical Motions to Dismiss for Lack of Subject Matter Jurisdiction, the Court will only discuss the motion as it applies to case number 01–3208. The holdings, though, will apply to all four cases.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Introduction

The backdrop for this case is the well publicized civil unrest in Colombia, South America. Sinaltrainal ("Sinaltrainal") and The Estate of Isidro Segundo Gil ("Gil") (collectively "Plaintiffs") seek to hold Defendants Coca–Cola U.S.A., Coca–Cola Colombia, Bebidas y Alimentos ("Bebidas"), Panamerican Beverages, Inc., ("Panamerican"), Richard I. Kirby ("Kirby"), and Richard Kirby Kielland ("Kielland") (collectively "Defendants") liable for the murder of Gil committed by a paramilitary unit in Carepa, Colombia in violation of international law and the law of the United States and Florida. The six count complaint alleges that members of the paramilitary unit shot Gil, a leader in the Sinaltrainal trade union, because he was attempting to organize employees at the Coca–Cola U.S.A. bottling plant that Bebidas owned in Carepa. Counts I and II are causes of action under the Alien Tort Claims Act ("ATCA"), 28 U.S.C. § 1350,[2] and the Torture Victim Protection Act of 1991 ("TVPA"), Pub.L. No. 102–256, 106 Stat. 73 (1992) (codified at 28 U.S.C. § 1350 Note). Count III is a claim for violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.* Count IV, is a claim for Defendants' denial of the rights to associate and organize union activity in violation of the ATCA. Count V is a claim for wrongful death under state, federal and Colombian law, and Count VI is a claim for violation of state law by aiding and abetting the paramilitary unit responsible for Gil's death.

### B. The parties [3]

The events giving rise to these claims occurred against a backdrop of civil war that has plagued Colombia with violence and terror for over forty years. The civil unrest involves so-called left wing guerrilla groups, right wing paramilitary units, and the Colombian government, including its military and police forces. "Central Unitaria de Trabajadores de Colombia," ("CUT") is the largest trade union confederation in Colombia. Sinaltrainal, as a member of the CUT, has organized local chapters in an attempt to negotiate improved working conditions for beverage industry employees such as those at the Bebidas bottling plant. Trade unions have allegedly become associated with the leftist guerrilla ideology to such an extent that various paramilitary units have tortured, abused, and murdered trade union members throughout the country. In this case, Plaintiff Gil was an employee of Bebidas and a leader in the local Sinaltrainal chapter when he was shot inside the Bebidas plant by members of a paramilitary unit as he arrived at work on December 5, 1996. Plaintiffs seek to hold the Defendants liable for his murder.

Bebidas is a small corporation, closely owned and managed by Kirby and his son, Kielland. Kirby, from his home in Key Biscayne, Florida, makes all day-to-day decisions concerning the operation of Bebidas. Kielland is the on-site manager of plant operations. Management decisions are implemented in Colombia by Kielland, other members of Kirby's family, or other authorized employees who work for Bebidas. Plaintiffs allege that profits from Bebidas are transferred to and commin-

---

**2.** The statute vests a district court with "original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350.

**3.** The facts are drawn from the complaint except where noted. As references to specific allegations in the complaint are needed, they will be cited as "Gil at ¶ __."

gled with personal bank accounts held by Kirby in Miami, Florida and other locations outside of Colombia. Plaintiffs further allege "on information and belief" that Kirby and Kielland have obtained loans and other monies from Bebidas without observing corporate formalities. By dominating the affairs of Bebidas in this manner, Plaintiffs contend Kirby and Kielland have made Bebidas an alter ego or agent of themselves such that they are liable for the Bebidas plant manager's wrongful conduct that resulted in the murder of Gil, an employee of Bebidas.

Coca–Cola U.S.A., a Delaware corporation with corporate offices in Atlanta, Georgia, manufactures and distributes soft drink beverages throughout the world. Coca–Cola Colombia, a wholly-owned subsidiary of Coca–Cola U.S.A. with corporate offices in Bogota, is responsible for manufacturing and distributing Coke products to Bebidas and all other bottlers in Colombia. Coca–Cola U.S.A. makes all major decisions concerning the production, distribution, marketing, and presentation of its products, and communicates and enforces its directives to Colombian bottlers through Coca–Cola Colombia.

Coca–Cola U.S.A.'s control over the operations at Bebidas is governed by a Bottler's Agreement. According to the terms of the agreement, Coca–Cola U.S.A. holds the right to supervise and control the quality, distribution, and marketing of its products, including the right to terminate or suspend a bottler's operations for noncompliance with its terms and conditions. Plaintiffs allege the agreement also gives Coca–Cola U.S.A. the right to control labor policies and practices at Bebidas.

Plaintiffs allege Coca–Cola U.S.A. controls day-to-day activities at Coke Colombia and, thus, has made Coca–Cola Colombia either the alter ego or agent of Coca–Cola U.S.A.. They further allege that the level of control Coca–Cola U.S.A. exercises over the bottling operation, through the Bottler's Agreement, makes Kirby, Kielland and Bebidas the alter egos or agents of Coca–Cola U.S.A.. Thus, Plaintiffs conclude that Coca–Cola U.S.A. is ultimately jointly and severally liable for Gil's murder.

## C. Colombian Law 48

In 1968 the Colombian Congress passed Law 48, which authorized the Ministry of National Defense to "protect ... as private property arms that are considered as for the exclusive use of the Armed Forces." Plaintiffs allege this law authorized armed civil patrols and thus permitted the Colombian Defense Ministry to create and provide weapons to paramilitary units that still exist today. Plaintiffs further allege that military and civil authorities tolerate the paramilitary, allow it to operate, and often cooperate, protect or work in concert with paramilitary units. Specifically, Plaintiffs allege that the people who murdered Gil were members of a paramilitary unit operating openly in Carepa, with the support and cooperation of the military and police forces in the area.[4] Thus, according to the Plaintiffs' theory, the paramilitary unit responsible for Gil's death was sanctioned by the Colombian government in Carepa.

Defendants acknowledge the existence of paramilitary units, but dispute the allegation that the government supports, cooperates, sanctions or otherwise works in concert with any paramilitary unit. According to Defendants, the Colombian government does not sanction the paramilitary activity in any fashion.

---

**4.** *See* Gil at ¶¶ 32, 34, 46.

### D. Isidro Gil's Murder

In June of 1995 Gil was elected to the executive board of the local Sinaltrainal union in Carepa. The following month, Bebidas hired members of the paramilitary to work in the sales and production departments of the company. In September of 1995, Kirby and Kielland hired Ariosto Milan Mosquera to manage the bottling plant. Mosquera immediately began aggressively and publicly threatening to destroy the union. He allowed paramilitary members access to the plant and made a specific agreement with local paramilitary leaders to drive the union out of the Bebidas plant by using threats and violence, if necessary. The paramilitary frequently intimidated employees at the plant.

In 1996, Sinaltrainal entered into labor negotiations with Bebidas, seeking to increase security for trade unionists and to stop Mosquera from threatening the union and cooperating with the paramilitary. Kielland, who participated in the negotiations, refused these requests. On September 27, 1996 Sinaltrainal submitted a letter to Bebidas accusing Mosquera of working with the paramilitary to destroy the union, and urging Bebidas to protect trade unionists from the paramilitaries who were threatening employees. Copies of the letter were sent to Coke Colombia.

On the morning of December 5, 1996, two paramilitary members approached Gil as he arrived at work. They said they needed to enter the Bebidas plant. As Gil opened the door, the paramilitaries shot and killed him. Witnesses identified the murderers as paramilitary members who had previously appeared at the Bebidas plant with Mosquera. That night, the same paramilitary members started a fire in the local union hall of Sinaltrainal. Two days later, at 8:00 a.m., paramilitaries arrived at the Bebidas plant, where they assembled the employees and told them that unless the employees resigned from the union, they would face the same fate as Gil. The employees then entered Mosquera's office and signed resignation forms that he had prepared. Many union members permanently fled Carepa after the forced resignations and continue in hiding for fear of their lives. Consequently, the local Sinaltrainal union no longer exists in Carepa.(Gil at ¶¶ 55–57).

### E. Procedural Posture

Defendants Coca–Cola U.S.A., Coca–Cola Colombia, Kirby, Kielland, and Bebidas have moved to dismiss for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1). Defendants' claim that this Court does not have subject matter jurisdiction over this cause of action because Plaintiffs have failed to (1) allege the necessary elements to establish jurisdiction under the ATCA, (2) state a claim under TVPA, and (3) allege facts necessary to satisfy either the effects test or conduct test under RICO. However, Plaintiff's argue that the ATCA, TVPA, and RICO claims are adequately plead, and therefore, the court has subject matter jurisdiction over all Defendants. As such, the Plaintiffs state that the motion to dismiss for lack of subject matter should be denied.

## II. STANDARD OF REVIEW FOR SUBJECT MATTER JURISDICTION

### A. Challenging Subject Matter Jurisdiction

Subject matter jurisdiction can be challenged on a Rule 12(b)(1) motion either facially or factually. *Lawrence v. Dunbar,* 919 F.2d 1525, 1529 (11th Cir.1990); *Garcia v. Copenhaver, Bell & Assocs.,* 104 F.3d 1256, 1260–61 (11th Cir.1997). A facial challenge presumes the allegations in the complaint to be true and tests whether they are sufficient. The question thus pre-

sented in this type motion is whether the allegations, if proven, would establish subject matter jurisdiction. *See Lawrence,* 919 F.2d at 1529. In a factual challenge, the defendant tests the accuracy of the allegations by establishing facts that contradict the allegations and show a lack of subject matter jurisdiction. *Garcia,* 104 F.3d at 1261. A factual challenge, therefore, requires the court to look beyond the pleadings and review other evidence such as testimony and affidavits. *Id.* In a factual challenge, the defendant has the burden to produce evidence to contradict the plaintiff's allegations. If the burden is met, the allegations do not carry a presumption of truthfulness. *Scarfo v. Ginsberg,* 175 F.3d 957, 960 (11th Cir.1999). The line between a facial and factual challenge, and thus the manner in which the court reviews the allegations in the complaint, is strictly observed unless an authoritative source of law creates some additional requirement to establish subject matter jurisdiction. *Id.* at 961.

Defendants contend that the ATCA requires a heightened pleading standard to establish subject matter jurisdiction. They find Plaintiffs' allegations conclusory and speculative, thereby failing to meet the standard. Plaintiffs contend that the heightened standard applies only to one element of an ATCA claim (the third element concerning a violation of international law which is discussed below), and that the usual rule of accepting well pleaded allegations should be applied to the first two elements of the ATCA claim. The Court believes that, based on the allegations in the complaint and the memoranda of law require, it must address both methods available under Federal Rule of Civil Procedure 12(b)(1) for challenging subject matter jurisdiction, and then decide whether either method permits the Court to accept subject matter jurisdiction under the ATCA and TVPA.

In this case, much effort has been expended in arguing what the parties apparently consider to be a facial challenge to jurisdiction. Defendants' expressly state they are raising a facial challenge. Plaintiffs contend the allegations of the complaint must be taken as true, indicating that a factual challenge is appropriate. In the complaint, Plaintiffs attempt to bolster the allegation that the paramilitary unit either had a symbiotic relationship or was pervasively entwined with the Colombian government, and thus that the paramilitary murdered Gil under color of law, by referring to or quoting reports authored by Human Rights Watch, Amnesty International, the U.S. Department of State, and other agencies interested in human rights violations. In addition, the complaint alleges that Colombia's Law 48 is the foundation for the symbiotic relationship. (Gil at ¶¶ 6, 34–41; Plaintiffs' memorandum at pp. 25–26.) Defendants' refute the allegations of a symbiotic relationship and pervasive entwinement with contentions resting on factual assertions derived from some of the same published reports cited by Plaintiffs (publications from the U.S. State Department and Human Rights Watch) and a written opinion from a Colombian court. They appended to their memorandum of law the opinion of the Supreme Court of Justice in Colombia, declaring a portion of Law 48 unconstitutional, to contradict the allegations relating to the nature of the relationship between the Colombian government and the paramilitary unit which murdered Gil. (Defendants' memorandum at pp. 27–32 and Exhibits A and B; reply memorandum at Exhibit B.) Neither party specifically argued that the motion to dismiss should be considered as a factual challenge to jurisdiction, although both have asked the court to look beyond mere allegations in the complaint and examine documents not attached as exhibits to the complaint. For

this reason, the motion to dismiss for lack of subject matter jurisdiction will be analyzed as both a facial and a factual challenge.

## B. Subject Matter Jurisdiction under the ATCA

### 1. Facial Challenge

■ In a facial challenge to subject matter jurisdiction, a district court takes the allegations of the complaint as true for purposes of the motion to dismiss to determine whether the complaint has sufficiently alleged a basis for subject matter jurisdiction. *Garcia,* 104 F.3d at 1261. Three elements are required to establish subject matter jurisdiction under the ATCA: (1) the plaintiff must be an alien asserting a claim (2) for a tort that is (3) a violation of international law. *Filartiga v. Pena–Irala,* 630 F.2d 876, 887 (2d Cir.1980). The first two elements are not in dispute. With respect to the third element, and to survive a 12(b)(1) motion, the complaint must identify the specific international law that the defendant allegedly violated. *Kadic v. Karadzic,* 70 F.3d 232, 238 (2d Cir.1995); *Filartiga,* 630 F.2d at 880. This is a higher standard of pleading than that traditionally required to survive a 12(b)(1) motion, and it applies only to the third element of an ATCA claim. *See Kadic,* 70 F.3d at 238. The notice pleading standard applies to the first two elements of the ATCA claim.

The heightened standard requires that the complaint identify facts showing Defendants violated a specific international law. In the context of this case, Plaintiffs attempt to state an international law violation by alleging that the private individuals who shot Gil committed either a war crime or a tort under color of law that exceeded universally recognized standards of civilized conduct. *See Kadic* at 239–40, 245; *Filartiga* at 889; *Forti v. Suarez–Mason,* 672 F.Supp. 1531, 1546 (N.D.Cal.1987).

■ To plead a war crime, Plaintiffs must allege facts sufficient to show that a private individual, who was a party to an armed conflict, committed a tort against civilians in the course of that conflict. *Kadic* at 243–244. A war crime committed by a private individual is actionable only if committed in the course of hostilities that are related to an ongoing war. *Id.*

■ Taking the facts alleged as true, the complaint clearly alleges that a civil war involving the guerillas, paramilitary, and Colombian government existed at the time Gil was murdered. The complaint also alleges, however, that Gil was murdered by paramilitaries acting in their private capacity to further the "business interests and activities" of Coca–Cola Colombia. (Gil at ¶ 29.) In fact, Plaintiffs state that "[a]ll of the wrongful acts alleged herein were committed by individuals who were acting within the course and scope of a business relationship with Coca–Cola Colombia..." (Gil at ¶ 28.) Although the complaint alleges the existence of an ongoing civil war, Plaintiffs do not allege Gil was murdered in the course of a conflict between the guerillas, and the paramilitaries or Colombian military or police, on the morning of December 5, 1996. For example, there are no allegations that Gil was an innocent civilian who was shot that day, either deliberately or accidentally, during an armed conflict in Carepa. The complaint clearly alleges that the paramilitaries were the "hired guns" of Bebidas, Coca–Cola U.S.A., Coca–Cola Colombia, Kirby, and Kielland, who acted on behalf of the Defendants when they shot Gil, and that the paramilitaries acted to further Defendants' business interests, however, the allegations do not establish that Gil was murdered in the course of an ongoing war. The complaint, therefore, fails to allege a war crime sufficient to invoke subject matter jurisdiction.

The failure to allege a war crime is not fatal to jurisdiction under the ATCA, however. *See Kadic,* 70 F.3d at 243 (summary execution not perpetrated in the course of a war crime violates international law if committed by state officials or private individuals acting under color of law.) According to the holding in *Kadic,* if the complaint alleges that the Defendants murdered Gil by acting together with the paramilitary unit who acted under color of law by acting in concert with Colombian officials or with significant aid from the Colombian government, then an international law violation is sufficiently stated for purposes of subject matter jurisdiction. *See id.* at 245 (citing *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 937, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982)).[5]

Applying *Kadic* to this case, Plaintiffs must allege that each Defendant acted jointly with the paramilitary unit in Carepa who murdered Gil under color of Colombian law. A general allegation that the paramilitary acted under color of Colombian law is all that is necessary to place Defendants on notice of the nature of the claim. The complaint meets the minimum requirement by specifically alleging that the Bebidas plant manager (Mosquera) conspired with the paramilitaries who "were functioning openly in Carepa, and were supported by and received cooperation from the military and police forces in the area such that the paramilitaries were in a symbiotic relationship with the military and police forces in the area" and that the paramilitary "are permitted to exist, openly operate under the laws of Colombia, and are assisted by government military officials." (Gil at ¶¶ 46, 64.) Plaintiffs further allege that the paramilitary has a "mutually-beneficial [sic] symbiotic relationship with the Colombia government's military."[6] (Gil at ¶ 35.) These details, if true, establish that the paramilitary murdered Gil under color of law by acting with significant aid from officials of the Colombian government.

Alleging the paramilitary acted under color of law does not end the jurisdictional inquiry because it does not establish that the Defendants violated international law by taking some action under color of law.

**5.** The *Kadic* court found cases interpreting 42 U.S.C. § 1983 to be a relevant guide on the "color of law" requirement for jurisdiction under the ATCA. This court also finds the jurisprudence of § 1983 applicable, and notes that there is no requirement to plead the color of law in a § 1983 claim with specific facts and details. *See Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 167–69, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993)(holding that federal courts may not apply a heightened pleading standard, more stringent than the usual pleading standard, in civil rights cases alleging municipal liability under § 1983); *Arnold v. Board of Educ. of Escambia County, Alabama,* 880 F.2d 305, 314 (11th Cir.1989) (holding § 1983 claim stated against school officials individually where complaint merely alleged a constitutional right violation and that officials acted under color of state law); *Busby v. City of Orlando,* 931 F.2d 764 n. 4 (11th Cir.1991) (holding § 1983 claim properly alleged where plaintiff "claimed deprivation of her job under color of law on the basis of race"). If there is no heightened standard for pleading an action taken under color of law in a § 1983 claim, as the Supreme Court and the Eleventh Circuit have held, there is no reason to impose a higher standard for the color of law element necessary to state an international law violation under the ATCA either.

**6.** A symbiotic relationship is one of the four tests recognized by the U.S. Supreme Court as establishing action taken by a private individual under color of law. *See Burton v. Wilmington Parking Auth.,* 365 U.S. 715, 723–24, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961) (a symbiotic relationship exists when the parties confer mutual benefits to each other such that their interdependence is crucial to each one's success). Thus, if proven, the allegation would establish that the paramilitary murdered Gil with the assistance of the Colombian government.

The complaint must also allege that each Defendant participated in Gil's death by acting together with the paramilitary. Plaintiffs attempt to meet this burden in three steps. First, Plaintiffs allege the Bottler's Agreement gives Coca–Cola U.S.A. control over all aspects of the bottling operation at Bebidas, including labor policies and employee security. Second, Plaintiffs allege a series of alter ego and/or agency relationships to link Mosquera's decision, as the Bebidas plant manager, to conspire with the paramilitary, to Kirby, Kielland, Coca–Cola Colombia and Coca–Cola U.S.A.. Third, the alter ego and agency allegations permit Plaintiffs to ultimately allege that Coca–Cola U.S.A. and Coca–Cola Colombia knew, either directly or through facts known to their alleged agents (Kirby, Kielland, and Bebidas), that Mosquera was working with the paramilitary to destroy the union and that plant employees were in danger. Coca–Cola U.S.A.'s complete control over Bebidas, together with the agency or alter ego relationships that link the Defendants together, in Plaintiffs' view, ties every Defendant to the conspiracy between Mosquera and the paramilitary that drove the Sinaltrainal labor union out of the Bebidas plant and resulted in Gil's murder. (Gil at ¶¶ 18–29; 42–40, 51.)

The Bottler's Agreement is central to Plaintiffs ATCA claim against the Coca–Cola Defendants. Plaintiffs contend that the Bottler's Agreement establishes that Coca–Cola U.S.A., through Coca–Cola Colombia, controlled all aspects of the Bebidas bottling operation.[7] The document belies Plaintiffs' claim. It establishes that Coca–Cola U.S.A. and Coca–Cola Colombia did not have a duty to monitor, enforce or control labor policies at a bottling plant, the failure of which would constitute a conspiracy or joint action with the paramilitary through Kirby, Kielland, or Bebidas. The Bottler's Agreement does not give Coca–Cola U.S.A. or Coca–Cola Colombia the duty or right to control all aspects of the Bebidas plant operation as alleged; rather, it is the type of agreement typically found in a franchise relationship. It permits Coca–Cola U.S.A. to require Bebidas, as a Coca–Cola bottler, to meet certain standards necessary to protect Coke's product in the marketplace (i.e. use of the trademark, packaging, quality control, etc.). Nothing in the agreement gives Coca–Cola U.S.A. the right, obligation, or much less the duty, as Plaintiffs argue, to control the labor policies or ensure employees' security at Bebidas. The Bottler's Agreement clearly refutes Plaintiffs' allegation that Coca–Cola U.S.A. had total control. Without such control, Plaintiffs cannot tie the Coca–Cola Defendants with their alleged alter egos or agents (Kirby, Kielland, Bebidas and Mosquera). Hence,

7. The main point of the claim against Coca–Cola U.S.A. and Coca–Cola Colombia concerns the Bottler's Agreement, which the Plaintiffs chose not to attach to the complaint. (Gil at ¶¶ 18–31.) In support of the motion to dismiss, Defendants filed and served a Standard International Bottler's Agreement form after oral argument, under seal, which is not the actual agreement governing the relationship between Coca–Cola U.S.A. and Kirby, Kielland, and Bebidas. Counsel for Coca–Cola U.S.A. represented, however, that the standard form agreement is substantially the same as the operative agreement, which was drafted in Spanish and not translated at the time of the hearing. Plaintiffs did not challenge the veracity of this representation after receiving service of the document. A document filed in support of a motion to dismiss is considered part of the pleadings if it is referred to in the complaint and is central to the plaintiff's claim. *Venture Assoc. Corp. v. Zenith Data Systems Corp.*, 987 F.2d 429, 431 (7th Cir.1993). *Accord Brooks v. Blue Cross and Blue Shield of Florida, Inc.*, 116 F.3d 1364, 1369 (11th Cir.1997). The Standard International Bottler's Agreement therefore is considered as part of the record to determine whether subject matter jurisdiction will lie in this court.

Plaintiffs cannot prove that the Coca–Cola U.S.A. or Coca–Cola Colombia violated international law by conspiring or acting jointly with the paramilitary in Carepa to murder Gil under color of law. Because the Bottler's Agreement establishes that the third element of the ATCA claim fails, the claim against Coca–Cola U.S.A. and Coca–Cola Colombia must be dismissed for lack of subject matter jurisdiction.

### 2. Factual Challenge

■ On a factual attack to subject matter jurisdiction, the defendant bears the burden of producing evidence sufficient to show the lack of jurisdiction. "[A] court's power to make findings of facts and to weigh the evidence depends on whether the factual attack on jurisdiction also implicates the merits of plaintiff's cause of action." *Garcia,* 104 F.3d at 1261. If the facts necessary to establish jurisdiction do not implicate the merits of the cause of action, the court weighs the evidence to determine whether it has jurisdiction over the claim, but if the jurisdictional facts also implicate the merits of the claim, the proper course of action is for the court to find jurisdiction and deal with the objection to jurisdiction as a direct attack on the merits of the claim. *Id.* "When the jurisdictional basis of a claim is intertwined with the merits, the district court should apply a Rule 56 summary judgment standard when ruling on a [Rule 12(b)(1) motion that] asserts a factual attack..." *Lawrence,* 919 F.2d at 1530.

As discussed above, Plaintiffs have successfully alleged that the paramilitary acted under color of law by alleging the paramilitary had a symbiotic relationship or was pervasively entwined with the Colombian military and police forces. Plaintiffs' maintain that Coca–Cola U.S.A., Coca–Cola Colombia, Kirby, Kielland, and Bebidas are liable under the ATCA because each Defendant, either through its own action or that of a co-defendant acting as an agent or alter ego, engaged in joint action with the paramilitary by virtue of Mosquera's actions in his capacity as the plant manager of Bebidas. To prevail on the ATCA claim, Plaintiffs must prove each Defendant acted jointly with the paramilitary by showing the Defendant engaged in a conspiracy or willfully participated with the paramilitary, through Mosquera. *See Unocal,* 110 F. Supp 2d 1294, 1306 (C.D.Ca.2000); *Wiwa,* 2002 WL 319887, at *13. Plaintiffs' theory will require proof of all the alleged agency and alter ego relationships — i.e., that Mosquera is an agent of Bebidas, that Bebidas is the agent or alter ego of Kirby and Kielland, that Kirby, Kielland or Bebidas is the agent or alter ego of Coca–Cola Colombia, and that Coca–Cola Colombia is the agent or alter ego of Coca–Cola U.S.A.. The existence of such agency and alter ego relationships, and thus a Defendant's liability for violating international law by acting jointly with the paramilitary, can only be proven by sifting facts and weighing circumstances. *See Burton,* 365 U.S. at 722, 81 S.Ct. 856. The facts and circumstances necessary to prove the alleged agency and alter ego relationships are the same as those required to resolve the question of whether the court has subject matter jurisdiction under the ATCA. Because the jurisdictional basis and the merits of the ATCA claim are intertwined, the proper course of action is to find subject matter jurisdiction and deal with Defendants' motion to dismiss for lack of jurisdiction as a direct attack on the merits of the claim. *See Garcia* 104 F.3d at 1261; *Lawrence,* 919 F.2d at 1529.

Pursuant to Federal Rule of Civil Procedure 56 and the standards for summary judgment, Defendants Kirby, Kielland, Bebidas, Coca–Cola Colombia, and Coca–Cola U.S.A. bear the burden of producing evidence to demonstrate why the ATCA claim

should be dismissed based on a set of undisputed facts. Defendants offer reports published by the U.S. State Department and Human Rights Watch, and an opinion of the Colombian Supreme Court finding the part of Law 48 relevant to this case unconstitutional. Defendants argue these documents establish they did not conspire or otherwise act jointly with the paramilitary in Carepa, who acted under color of law in murdering Gil. These documents, Defendants contend, show that the Colombian government did not create the paramilitary and that the paramilitary did not receive significant aid from the Colombian military and police forces. (Defendants memorandum at pp. 27–31; reply at pp. 13–14.)

Defendants Kirby, Kielland, and Bebidas have not met the evidentiary burden for at least two reasons. First, neither the reports published by the U.S. State Department and Human Rights Watch, nor the opinion of the Colombian Supreme Court conclusively prove that the paramilitary did not have a symbiotic relationship or a pervasive entwinement with the local Colombian government. Under the summary judgment standard, therefore, the documents are insufficient to refute the allegation, which must be viewed in the light most favorable to the Plaintiffs, that the paramilitary acted under color of law. Second, Defendants Kirby, Kielland and Bebidas have not produced any evidence to refute the allegation that Bebidas is the alter ego or agent of Kirby and Kielland, which ties Kirby and Kielland to Mosquera's decision to hire the paramilitary to impede Sinaltrainal's union activity at Bebidas. Furthermore, even if the Defendants had produced evidence on these issues, the court questions whether factual disputes would preclude granting the motion; neither party discussed this issue. Defendants Kirby, Kielland and Bebidas have thus failed to demonstrate that they are entitled to judgment as a matter of law on the ATCA claim.

Coca–Cola U.S.A. and Coca–Cola Colombia, on the other hand, have met the standard for judgment under Rule 56. Assuming, without deciding, that the paramilitaries could be found to have acted under color of law on this record, and for the reasons previously discussed, the Bottler's Agreement establishes that Coca–Cola U.S.A. and Coca–Cola Colombia did not conspire or act jointly with the paramilitary through Kirby, Kielland, or Bebidas. As with the facial challenge to subject matter jurisdiction, therefore, Plaintiffs cannot prove that the Coca–Cola Defendants violated international law by participating in Gil's murder, the third element of the ATCA claim. Accordingly, and as an alternative to dismissal for lack of subject matter jurisdiction, the court concludes Coca–Cola U.S.A. and Coca–Cola Colombia are entitled to judgment as a matter of law on the ATCA claim.

## C. Subject Matter Jurisdiction and the Torture Victims Protection Act:

■ Although the TVPA creates a private cause of action for torture and extrajudicial killing perpetrated by individuals acting under the color of law of any foreign nation, it does not confer jurisdiction standing alone.[8] Claims for torture and

---

**8.** The TVPA provides, in relevant part, for a civil cause of action against an individual who, under color of law of any foreign nation, subjects another person to torture or extrajudicial killing. 28 U.S.C. § 1350, note, § 2(a). Torture is defined as any intentional act inflicting severe pain or suffering taken against an individual in the offender's custody or physical control for the purpose of obtaining information, punishment, or intimidation. *Id.* at § 3(b)(1). An extrajudicial killing is defined as a deliberate killing that was not authorized by a judgment rendered in a court that afforded all the judicial guarantees recognized as indispensable in a civilized society. *Id.* at § 3(a). A district court must decline to hear a claim if the plaintiff has not exhausted

extrajudicial killing may be entertained only if they fall within the jurisdiction conferred by the ATCA *Abebe–Jira v. Negewo,* 72 F.3d 844, 848 (11th Cir.1996); *Kadic,* 70 F.3d at 246.

■ Defendants raise three issues involving subject matter jurisdiction under the TVPA. First, they all contend Plaintiffs have not sufficiently alleged that they acted under color of Colombian law. The color of law element of a TVPA claim is identical to that under the ATCA. For reasons explained under the ATCA analysis, the court does not have subject matter jurisdiction over the ATCA claim against Coca–Cola U.S.A. and Coca–Cola Colombia. Hence, there is no subject matter jurisdiction over the TVPA claim against the Coca–Cola Defendants either. Similarly, based on the ATCA analysis of both the facial and factual challenge above, Plaintiffs have sufficiently alleged that the paramilitary and Defendants Kirby, Kielland, and Bebidas acted under color of law.

■ The remaining Defendants—Kirby, Kielland, and Bebidas—next contend the complaint does not adequately allege that Plaintiffs have exhausted local remedies because they did not even attempt to seek relief in Colombia. The TVPA requires the court to decline to hear a claim "if the claimant has not exhausted adequate and available remedies in the place in which the conduct giving rise to the claim occurred." 28 U.S.C. § 1350, note, § 2(b). Plaintiffs allege that seeking legal redress in Colombia would have been futile because the Colombian government does not pursue perpetrators of anti-union violence like the paramilitary, Plaintiffs would have been subjected to retaliation for seeking to assert their legal rights, and any remedy in Colombia would have been inadequate

because it would not afford the complete relief available to Plaintiffs in this action. (Gil at ¶¶ 6–8.) Defendants' argument that Plaintiffs did not actually exhaust local remedies before filing suit is thus interpreted as a factual challenge to subject matter jurisdiction. Because the facts necessary to establish jurisdiction do not implicate the merits of the cause of action, the court must weigh the evidence to determine whether it has subject matter jurisdiction over the TVPA claim. *See Garcia,* 104 F.3d at 1261.

The wording of the statute clearly says a district court must dismiss a TVPA claim if the claimant has not exhausted local remedies. Plaintiffs correctly argue, however, that they are entitled to a presumption that local remedies have been exhausted, which Defendants must overcome before Plaintiffs are required to prove exhaustion or, presumably, the futility of exhausting local remedies. The Senate Committee Report for the TVPA outlines a detailed procedure for addressing exhaustion of remedies:

> [A]s an initial matter, the committee recognizes that in most instances the initiation of litigation under this legislation will be virtually prima facie evidence that the claimant has exhausted his or her remedies in the jurisdiction in which the torture occurred. The committee believes that courts should approach cases brought under the proposed legislation with this assumption.
>
> . . .
>
> Once the defendant makes a showing of remedies abroad which have not been exhausted, the burden shifts to the plaintiff to rebut by showing that the local remedies were ineffective, unobtainable, unduly prolonged, inadequate,

all adequate and available remedies in the place in which the conduct giving rise to the

claim occurred. *Id.* at § 2(b).

or obviously futile. The ultimate burden of proof and persuasion in the issue of exhaustion of remedies, however, lies with the defendant.

*Wiwa*, 2002 WL 319887, at *17 (quoting S.Rep. No. 249 (1991 WL 258662, *9–10)).

On a motion to dismiss for failure to state a claim, the *Wiwa* court, interpreting the Senate's comments, held that the defendant has the initial burden of demonstrating that the foreign court would be amenable to the claim. *Id.* As a threshold matter, the defendant must therefore overcome the presumption that local remedies have been exhausted by demonstrating that "alternative and adequate" remedies are available in the country in which the claim arose. The defendant must demonstrate not only that the foreign forum is amenable, but also that it would provide an adequate remedy by providing certain rights, such as the right to a speedy and fair trial. *Id.* Only after the defendant has met this initial burden of proving the availability of an adequate forum in the foreign country is the plaintiff required to demonstrate that such remedies are not, in fact, "adequate" or are "obviously futile." *Id.*; *Mehinovic v. Vuckovic*, 2002 WL 851751, *18 n. 30 (N.D.Ga.2002).

This court adopts the reasoning of *Wiwa*. Defendants Kirby, Kielland, and Bebidas have the burden to demonstrate that alternative and adequate remedies were available to Plaintiffs in Colombia, which they have failed to do. In fact, they have offered no evidence on the issue so the burden to prove the futility of remedies available in Colombia did not shift to the Plaintiff. Accordingly, the TVPA claim against Kirby, Kielland, and Bebidas cannot be dismissed for lack of subject matter jurisdiction.

■ Finally, Defendant Bebidas contends that as a private corporation it is not subject to suit under the TVPA. Bebidas interprets the phrase "an individual . . .

[who subjects another to torture or extrajudicial killing] shall, in a civil action, be liable for damages" as referring only to natural persons, arguing that Congress intended to hold liable only natural persons who commit torture or extrajudicial killing. 28 U.S.C. 1350, note, §§ 2(a)(1) and (2). Because a corporation is not a natural person, Bebidas reasons that the TVPA does not confer subject matter jurisdiction over a claim against a corporation. *See Beanal v. Freeport–McMoRan, Inc.*, 969 F.Supp. 362, 382 (E.D.La.1997). Plaintiffs argue that by imposing liability on "individuals who subject others to torture or extrajudicial killing," the word "individual" is equivalent to "person." By analogy, Plaintiffs point to the fact that corporations are generally treated as persons in other areas of law, therefore, liability under the TVPA should also extend to corporations.

Defendants correctly point out that the district court in *Beanal* held that private corporations are not liable under the TVPA. *Id.* However, the *Beanal* court also stated that "[c]ongress does not appear to have had the intent to exclude private corporations from liability under the TVPA." *Id.* The Senate Judiciary Committee Report explains that the purpose of the TVPA is to permit suits "against persons who ordered, abetted, or assisted in torture." S.Rep. No. 249, 102nd Cong., 1st Sess. (1991) (1991 WL 258662, *9–10). The Report does not mention any exemption for private corporations, *id.*, and courts have held corporations liable for violations of international law under the related ATCA. *See generally, NCGUB v. Unocal*, 176 F.R.D. 329 (C.D.Ca.1997); *Wiwa*, 2002 WL 319887 (both allowing suits against private corporations under the ATCA). Moreover, the Supreme Court in *Clinton v. New York* recently held that the term "individual" is synonymous with "person," acknowledging that

" 'person' often has a broader meaning in the law" than in ordinary usage. *Clinton v. New York*, 524 U.S. 417, 428 and n. 13, 118 S.Ct. 2091, 141 L.Ed.2d 393 (1998). Bearing in mind that a corporation is generally viewed the same as a person in other areas of law, it is reasonable to conclude that had Congress intended to exclude corporations from liability under the TVPA, it could and would have expressly stated so.

Given that the legislative history does not reveal an intent to exempt private corporations from liability, that private corporations can be sued under the ATCA, and that the term "individual" in consistently viewed in the law as including corporations, this court concludes that the TVPA claim against Bebidas should not be dismissed for lack of subject matter jurisdiction.

## III. RICO CLAIM

■ RICO is an expansive statute, broadly construed to reach a wide array of activity. *See United States v. Pepe*, 747 F.2d 632 (11th Cir.1984). Generally, Courts have concluded that this broad construction does not include international schemes largely unrelated to the United States. In *Brink's Mat Limited v. Diamond*, 906 F.2d 1519 (11th Cir.1990), the dissent, addressing the limitations RICO, stated "[i]t was not congressional intent, nor would it be proper were that the case, to deter the conduct of parties unconnected to the United States or to provide windfall civil judgments to citizens of any country who sue citizens of another country for fraudulent transactions which only casually touch upon the United States. Congress only intended to deter the conduct of individuals within the borders of this country" *Id.* at 1524. While this observation is dicta, several sister-courts have voiced similar holdings.

*Jose v. M/V Fir Grove*, 801 F.Supp. 349, 357 (D.Or.1991), relying on *Brink's*, held "the language and legislative history of RICO fail to demonstrate clear Congressional intent to apply the statutes beyond U.S. boundaries" and that the "procedural mechanisms contained within section 1965 are, on their face, limited to U.S. territory." Furthermore, in *Butte Mining PLC v. Smith*, 76 F.3d 287 (9th Cir.1996), the Ninth Circuit Court of Appeals stated "Congress in enacting RICO [did not have] the purpose of punishing fraud by aliens abroad even if peripheral preparations were undertaken by them here." *Id.* at 291.

However, these cases do not prohibit all extraterritorial application of RICO. In determining whether RICO applies extraterritorially, allegations must meet either the "conduct" test or the "effect" test. *North South Fin. Corp. v. Al–Turki*, 100 F.3d 1046 (2nd Cir.1996). Under the "conduct" test, this Court has jurisdiction where the conduct within the United States directly caused an foreign injury. Under this test, "mere preparatory activities, and conduct far removed from the [injury], will not suffice to establish jurisdiction." *Psimenos v. E.F. Hutton & Co.*, 722 F.2d 1041, 1046 (2d Cir.1983).

The "effects" test, this Court has jurisdiction when a foreign conduct at issue has "substantial" effects within the United States. *Consolidated Gold Fields PLC v. Minorco, S.A.*, 871 F.2d 252, 261–62 (2d Cir.1989). This test is met when the domestic effect is a "direct and foreseeable result of the conduct outside of the United States." *Id.* at 262. Additionally, the Court should be reluctant to apply U.S. law to foreign parties where the conduct only has remote or indirect effects within the United States. *Id.*

In the case at issue, Plaintiffs fail to allege any conduct satisfying either test.

Plaintiffs, in regard to the alleged RICO violations, do not assert that the alleged foreign conduct had a substantial effect within the United States. As such, under the effects test, Plaintiffs' fail to meet the required burden. Furthermore, Plaintiffs' complaint does not contain any allegations of improper activity or tortious conduct occurring within the United States. Plaintiffs' allegations of events occurring within the United States are too removed from the injury or are preparatory activities, neither which satisfy the effects test to establish jurisdiction within this Court.

Given that the complaint fails to satisfy either the conduct test or the effects test, this Court concludes that the RICO claim against all Defendants should be dismissed for lack of subject matter jurisdiction.

### CONCLUSION

For the above stated reasons, it is hereby

**ORDERED AND ADJUDGED** that Defendants' Joint Motion to Dismiss First Amended Complaint for Lack of Subject Matter Jurisdiction [DE# 55] is **GRANTED in part.**

1) The ATCA claim against Coca–Cola USA and Coca–Cola Colombia are dismissed for lack of subject matter jurisdiction.

2) The TVPA claim against Coca–Cola USA and Coca–Cola Colombia are dismissed for lack of subject matter jurisdiction.

3) All RICO claims are dismissed for lack of subject matter jurisdiction

It is further **ORDERED AND ADJUDGED** that:

1) These orders **SHALL** apply to Defendant Panamerican's Motion to Dismiss for Lack of Subject Matter Jurisdiction [DE# 45].