**Angel Enrique VILLEDA ALDANA, et al., Plaintiffs,**

v.

**FRESH DEL MONTE PRODUCE, INC. d/b/a Del Monte Fresh Produce Company and Compania De Desarrollo De Guatemala, S.A. (Bandegua), Defendants.**

No. 01–3399–CIV–MORENO.

United States District Court, S.D. Florida, Miami Division.

Dec. 12, 2003.

Robert A. Sugarman, Marcus Braswell, Sugarman & Susskind, P.A., Coral Gables, FL, Terry Collingsworth, Natacha Thys, International Labor Rights Fund, Washington, D.C., Counsel for Plaintiff.

Brian J. Stack, Stack Fernandez Anderson Harris & Wallace, P.A., Miami, FL, Counsel for Defendant.

### ORDER GRANTING DEFENDANTS' MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION

MORENO, District Judge.

The claims asserted by Plaintiffs in this action arise out of a series of events that took place in a Guatemalan village during an otherwise peaceful October day in 1999. Plaintiffs, all Guatemalan citizens, claim that Defendants Fresh Del Monte Produce, Inc., Del Monte Fresh Produce Company, and Compania de Desarollo Bananero de Guatemala, S.A. were active participants in torture and other human rights violations designed to put an end to their leadership in trade union activities.

Plaintiffs seek to invoke federal court jurisdiction under the Alien Tort Claims Act, 28 U.S.C. § 1350 ("ATCA"), the Torture Victims Protection Act of 1991 ("TVPA"), 28 U.S.C. § 1350, the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq.*, and 28 U.S.C. § 1332 and 28 U.S.C. § 1367 for their non-Federal claims. Before the Court is Defendants' Joint Motion to Dismiss the Third Amended Complaint for Lack of Subject Matter Jurisdiction and Failure to State Claim Upon Which Relief Can Be Granted. For the reasons set forth below, the motion to dismiss is GRANTED.

### I. BACKGROUND

On the evening of October 13 and into the morning of October 14, 1999 an armed group of Guatemalans kidnapped and detained Plaintiffs, who were officers

of Sindicato de Trabajadores del Banano de Izabla ("SITRABI"), the labor union representing the workers at Del Monte's Bobos banana plantation in Guatemala. SITRABI was about to call a strike in response to alleged company violations of the collective bargaining agreement. Over the course of the rest of night and into the next morning, Plaintiffs claim that they were subject to a whole host of violations of international law perpetrated in part by Defendants' agents and employees, including kidnapping, torture, and unlawful detention.

The Plaintiffs, Angel Enrique Villeda Aldana ("Villeda"), Jorge Agustin Palma Romero ("Palma"), Oscar Leonel Guerra Evans, Lyionhel McIntosh Rodriguez, Marel Martinez ("Martinez"), Gumerzindo Loyo Martinez, and Rigoberto Alvayero Hernandez (collectively, "Plaintiffs") are all citizens of Guatemala that are currently residing in California and Nevada. They brought suit for equitable relief and for damages to remedy the injury to their persons caused by the alleged wrongful conduct of Defendants Fresh Del Monte Produce, Inc. ("Del Monte, Inc."), Del Monte Fresh Produce Company ("Del Monte Fresh"), and Compania De Desarollo Bananero De Guatemala, S.A. ("Bandegua"). Plaintiffs allege that Del Monte, Inc. is a for-profit company that controls, manages or supervises all aspects of production, distribution and marketing of its fresh produce on a worldwide basis from its office in Coral Gables, Florida. Defendants Del Monte Fresh, a Delaware corporation, and Bandegua, a Guatemalan corporation, are alleged to be wholly-owned subsidiaries of Del Monte, Inc.

The Third Amended Complaint ("TAC") alleges that through its wholly-owned subsidiaries Del Monte, Inc. owns, leases and/or operates banana plantations in Guatemala. TAC ¶ 22. Among the plantations it owns and operates in Guatemala is the Zaculeu Lanquin Arapahoe Plantation ("Bobos Plantation") in the Bobos District Municipality of Morales Izabal in Guatemala.

In September 1999, Bandegua was in negotiations with officers of SITRABI, the Guatemalan labor union for plantation workers. Plaintiffs allege that Del Monte, Inc. was involved in these negotiations. TAC ¶ 26. Bandegua had announced that it was terminating operation of the Bobos plantation and laying off 918 workers, all SITRABI members. Id. Defendant Del Monte, Inc. and Bandegua were engaged in negotiations with SITRABI for a new collective bargaining agreement covering the workers at the Bobos plantation prior to the events on that fateful day. Id. Plaintiffs were among the terminated workers, and they allege that Defendants decided to cripple the Union.

Beginning on the afternoon of October 13, 1999, the Third Amended Complaint alleges a harrowing series of events. Plaintiffs allege that leaders of a security force met with employees and/or agents of the Del Monte defendants at a local restaurant to plan violent action against the Plaintiffs and other SITRABI leaders. Id. ¶ 30. Believed to be present at this meeting was Bandegua's General Manager, Jorge Arturo Osborne Escalante, and two contractors for Del Monte, who had performed regular services for Defendants. Id. ¶ 31. Plaintiffs allege that the result of this meeting was a plan and agreement to kidnap and terrorize the Plaintiffs in order to break the SITRABI union by eliminating the leadership and gaining a bargaining advantage in the ongoing labor dispute. Id. ¶ 31.

In the early evening, the security force, now allegedly a large gang, came to the SITRABI headquarters in the Municipality of Morales, Izabal to carry out and

implement the plan. Plaintiffs Palma and Evans were in the SITRABI office when the security force arrived. The Third Amended Complaint alleges that they were detained at gunpoint by the security force and threatened with death. Evans was taken to an adjoining room by the security force and kept there under heavy guard, while being confronted with threats of death and frequent jabbing with the weapons. Palma was ordered into a car, and forced to show where another Plaintiff, Marel Martinez, resided. Once the security force reached Martinez's house, they abducted him at gunpoint. The two Plaintiffs were then driven back to the SITRABI office. Martinez then was forced to telephone Plaintiff Aldana, another SITRABI leader, and tell him to come to the office right away. Martinez was warned that if he failed to deliver the message properly, he would be killed. Martinez was also forced to call other SITRABI leaders and summon them to the office.

Through interdiction by this security force and threats, the other Plaintiffs were rounded up and taken along with the already detained Plaintiffs, Aldana, Martinez, Palma, Evans and taken to the auditorium of the Union office. By now, they had been repeatedly threatened with death as multiple weapons were pointed at their heads. They were accused of being responsible for the declining business in the area, and their captors began debating the next course of action. Plaintiffs allege that they sustained injuries as they were pushed and shoved around. *Id.* ¶ 46.

At some point in the ensuing confusion, the current mayor, then a candidate, for the mayor of Morales, Manuel Sosa Castaneda arrived and with his intervention, a consensus was reached where the two main SITRABI leaders, Aldana and Martinez, would be taken to a radio station where they would be forced to denounce the union. Id. ¶ 47. Accompanied by the mayor at the time, Israel Farcia, the two Plaintiffs were transported to the radio station and forced at gunpoint to make an on-air announcement that the labor dispute with Del Monte was over, the workers should return to work, and that the leaders of SITRABI would resign their posts. *Id.* ¶ 50

After the completion of the announcement, the two Plaintiffs were taken at gunpoint back to the SITRABI office. They allege that they were forced at gunpoint to sign form resignation and release letters that were faxed to the office. Del Monte's Chief of Security at the plantation, Carlos Enrique Hernandez Diaz, was present and allegedly speaking to persons in the management staff of Del Monte by walkie talkie. *Id.* ¶ 51. Once the letters were signed, the Plaintiffs allege they were threatened with death if they did not leave the plantation area. Plaintiffs Aldana and Palma were pounded in the chest to drive the point home. *Id.* ¶ 54.

At 2:00 A.M. on the morning of October 14, 1999, Plaintiffs were released from their detention and, after hastily gathering their families, they fled to Guatemala City. *Id.* ¶ 55. They attempted to complain to the Ministry of Labor, but they had been pre-empted by the General Manager for Bandegua, who had claimed that all the Plaintiffs had signed voluntary letters of resignation.

Shortly after these events, in March 2001, after living in hiding, five of the Plaintiffs were relocated to the United States with the intervention of the U.S. embassy in Guatemala.[1] They were all

---

1. The Third Amended Complaint alleges that Del Monte provided $50,000 in monetary assistance to help cover the costs of relocating five of the Plaintiffs in response to pressure

recently granted asylum status. The Plaintiffs filed this action in Federal Court on August 2, 2001. In response to court order, the Plaintiffs filed their Third Amended Complaint ("TAC") on February 5, 2003. Defendants filed their motions to dismiss on May 13, 2002.[2] The Court denied Defendant's Motion to Dismiss for *Forum Non Conveniens* on June 3, 2003 and also provisionally denied Bandegua's Motion to Dismiss for Lack of Personal Jurisdiction pending jurisdictional discovery which ended on July 30, 2003. Additionally, the Court solicited supplemental memoranda from the parties on the disputed issues of international law. Both Plaintiffs and Defendants have submitted declarations from experts on international law for the Court's inspection.

## II. LEGAL STANDARD

A court will not grant a motion to dismiss unless the plaintiff fails to allege any facts that would entitle the plaintiff to relief. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). When ruling on a motion to dismiss, a court must view the complaint in the light most favorable to the plaintiff and accept the plaintiff's well-pleaded facts as true. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *St. Joseph's Hosp., Inc. v. Hosp. Corp. of Am.*, 795 F.2d 948, 953 (11th Cir.1986).

A defendant may move to dismiss a complaint if it fails to allege facts sufficient to invoke the court's subject matter jurisdiction. Fed.R.Civ.P. 12(b)(1). The party invoking jurisdiction bears the burden of producing the necessary facts to establish

from the International Union of Food, Agricultural, Hotel, Restaurant, Catering, Tobacco, and Allied Workers' Associations ("IUF"). Apparently, two of the leaders of the armed gang, who had assumed management positions in Del Monte-controlled operations were removed, also in response to IUF pressure.

subject matter jurisdiction. *Taylor v. Appleton*, 30 F.3d 1365, 1367 (11th Cir.1994).

## III. ANALYSIS

### A. THE ALIEN TORT CLAIMS ACT (COUNTS I & III)

Plaintiffs seek to redress human rights violations under the ATCA and the TVPA. As noted above, the Plaintiffs complain individually of (1) torture, (2) kidnapping, (3) unlawful detention, (4) crimes against humanity, (5) denial of fundamental right to associate and organize. They rest responsibility for these acts upon a theory of joint action between Defendants and the local officials.

■ Under the Alien Tort Claims Act, 28 U.S.C. § 1350, violations of the law of nations may confer federal jurisdiction. The ATCA provides that the "district court shall have original jurisdiction over any action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350. Federal subject matter jurisdiction exists when: (1) an alien sues (2) for a tort (3) committed in violation of the law of nations. *Kadic v. Karadzic*, 70 F.3d 232, 238 (2d Cir.1995).

■ The Eleventh Circuit has recognized that the ATCA "establishes a federal forum where courts may fashion domestic common law remedies to give effect to violations of customary international law." *Abebe–Jira v. Negewo*, 72 F.3d 844, 848 (11th Cir.1996), *cert. denied*, 519 U.S. 830,

2. In the Order of Clarification, dated *February 7, 2003*, the Court ruled that the motions to dismiss filed in response to the Second Amended Complaint have been converted to the Third Amended Complaint.

117 S.Ct. 96, 136 L.Ed.2d 51 (1996).[3] Thus, the ATCA "creates both subject matter jurisdiction and a private right of action." *Estate of Winston Cabello v. Fernandez–Larios*, 157 F.Supp.2d 1345 (S.D.Fla.2001) (citing *Abebe–Jira*, 72 F.3d at 848). In this case, it is undisputed that the plaintiffs are aliens suing in tort so the Court turns to a discussion of the dispositive third element.

■ The ATCA requires that a more searching review of the merits to establish jurisdiction that is required under the more flexible "arising under" formula of Section 1331. *Amlon Metals, Inc. v. FMC Corp.*, 775 F.Supp. 668, 671 (S.D.N.Y. 1991); *accord Kadic*, 70 F.3d at 238.[4] With respect to the third element, and to survive a 12(b)(1) motion to dismiss, the complaint must identify the specific international law that the defendant allegedly violated. *Kadic*, 70 F.3d at 238. This is a higher standard of pleading than traditionally required. *Id.* The heightened pleading standard requires that the complaint identify facts showing Defendants violated a specific international law. *Sinaltrainal v. Coca–Cola, Co.*, 256 F.Supp.2d 1345, 1352 (S.D.Fla.2003).

Thus, jurisdictional concerns are not satisfied by merely alleging a colorable violation of the law of nations. *See id.* "[T]his court must thoroughly examine the merits of the plaintiff's complaint to determine whether it has [ATCA] jurisdiction." *Jogi v. Piland*, 131 F.Supp.2d 1024, 1026 (C.D.Ill.2001). Moreover, the "paucity of suits successfully maintained under [the ATCA] is readily attributable to the statute's requirement of alleging a violation of the law of nations at the jurisdictional threshold." *Filartiga v. Pena–Irala*, 630 F.2d 876, 887–888 (2d Cir.1980). Finally, although Plaintiffs' claims raise significant issues of international law, the task before the Court is not to resolve them; rather the Court must determine whether the complaint adequately pleads a violation of the law of nations.

### 1. Defining the Law of Nations

■ Under the ATCA, the "law of nations" refers to a body of law known as customary international law. *Flores v. Southern Peru Copper Corp.*, 343 F.3d 140, 154 (2d Cir.2003). Conduct violates the "law of the nations" if it contravenes "well-established, universally recognized norms of international law." *Kadic v. Karadzic*, 70 F.3d 232, 239 (2d Cir.1995), *cert. denied*, 518 U.S. 1005, 116 S.Ct. 2524, 135 L.Ed.2d 1048 (1996).

Defining customary international law is no simple feat; it is "discerned from myriad decisions made in numerous and varied international and domestic arenas." *Flores*, 343 F.3d at 154. In *United States v. Smith*, 18 U.S. (5 Wheat.) 153, 160–61, 5 L.Ed. 57 (1820), the Supreme Court counseled that the law of nations "may be ascertained by consulting the works of jurists, writing professedly on public law; or

---

**3.** Whatever wisdom there is in Judge Randolph's concurring opinion in *Al Odah v. United States*, 321 F.3d 1134, 1145–50 (D.C.Cir.2003) (Randolph, J. concurring), this Court is bound by the 11th Circuit's decision in *Abebe–Jira v. Negewo*, 72 F.3d at 848. If the 11th Circuit, sitting *en banc*, wishes to adopt Judge Randolph's analysis of the statute it is free to do so within the confines of the Circuit rules to reverse its prior decision. But this Court cannot.

**4.** The parties dispute whether notice pleading standards should apply to their allegations regarding other non-jurisdictional issues. Plaintiffs continually claim throughout their briefs that this motion requires no heightened pleading standard outside of the "more searching review" required to establish that a specific violation of international law is identified. *Kadic v. Karadzic*, 70 F.3d 232, 238 (2d Cir.1995).

by the general usage and practice of nations; or by judicial decisions recognising and enforcing that law." Moreover, courts "must interpret international law not as it was in 1789, but as it has evolved and exists among the nations of the world today." *Kadic*, 70 F.3d at 238 (quoting *Filartiga v. Pena–Irala*, 630 F.2d 876, 881 (2d Cir.1980)).

■ Customary international law, in short, is composed "only of those rules that States universally abide by, or accede to, out of a sense of legal obligation and mutual concern." *Flores*, 343 F.3d at 154. The Second Circuit has succinctly set out three principles that flow from this proposition. *Flores*, 343 F.3d at 140. First, States must universally abide by the rule embodied in customary international law. *Id.* Second, States must accede to it out of a sense of legal obligation. *Id.* Third, customary international law addresses only those "wrong[s] that are 'of mutual, and not merely several, concern' to States." *Id.* (quoting *Filartiga*, 630 F.2d at 888). This aspect of customary international law is often overlooked. "Matters of several concern among States are matter in which States are separately and independently interested." *Id.* International accords can often signify a matter of multinational concern. Therefore, even if certain conduct is universally proscribed by States in their respective domestic legal regimes that fact alone does not automatically create an actionable violation of international law under the ATCA.

■ The inquiry does not end there. Stringent and rigorous standards are applied by courts in ATCA cases. The tort pled must be "definable, obligatory (rather than hortatory) and universally condemned." *Forti*, 672 F.Supp. at 1539–41. To satisfy this specificity requirement, the following is required: (1) no state condones the act in question, and there is a

recognizable "universal" consensus of prohibition against it; (2) there are sufficient criteria to determine whether a given action amounts to the prohibited act and thus violates the norm; and (3) the prohibition against it is non-derogable and therefore binding at all times upon all actors. *Xuncax v. Gramajo*, 886 F.Supp. 162, 184 (D.Mass.1995). Moreover, citing sources of international law that "merely refer to a general sense of ... responsibility and state abstract rights and liberties devoid of articulable or discernable standards and regulations to identify practices that constitute international ... abuses or torts" is insufficient to support a claim that a particular conduct is universally proscribed by the law of nations. *Beanal v. Freeport–McMoran, Inc.*, 197 F.3d 161, 167 (5th Cir.1999); *see also Flores v. S. Peru Copper Corp.*, 253 F.Supp.2d 510, 524 (S.D.N.Y.2002), *aff'd, Flores v. S. Peru Copper Corp.*, 343 F.3d 140 (2nd Cir.2003).

Defendants' argument proceeds on two fronts: *first*, they assert none of these claims rises to the level of international law because either the conduct does not implicate international norms or the international norm itself is not actionable under the ATCA; and *second*, they assert that the element of state action, an essential component in pleading a violation of certain norms of international law, is missing from all these claims. *See Carmichael v. United Technologies Corp.*, 835 F.2d 109, 113 (5th Cir.1988). The Court will analyze each claim separately and then discuss the issue of state action with respect to all the claims at the conclusion of the discussion.

### 2. Torture

■ While deliberate torture under color of law is actionable under the ATCA and the TVPA, defendants contend that the allegations in the Third Amended Complaint, even assuming them to be true, do not constitute a violation of "universally

accepted norms of international law." *See Filartiga*, 630 F.2d at 878. Defendants claim that read together, the allegations only demonstrate coercive conduct designed to intimidate union leaders into disavowing their union and labor cause. Indeed, Defendants argue that there are no allegations of temporary or permanent physical injury.

Defendants assert that the conduct pales in comparison to the forms of torture that have been held to be actionable under the ATCA. *See Abebe–Jira*, 72 F.3d at 848 (affirming judgment under the ATCA for women imprisoned for three to ten months, during which imprisoned women were stripped and bound, whipped with wire, hung by a pole, severely beaten, and tortured to aggravate the resulting wounds); *Filartiga*, 630 F.2d at 877 (finding kidnapping and torturing to death by government official constituted official torture in violation of the law of nations); *Eastman Kodak v. Kavlin*, 978 F.Supp. 1078 (S.D.Fla.1997) (Ryskamp, J.) (court "reluctantly" denied motion to dismiss torture claim based on 10–day detainment accompanied by physical injuries).

Plaintiffs disagree and contend that the specific acts as alleged do constitute a valid claim of torture. First, the Plaintiffs claim that they were subjected to extreme mental anguish resulting from the intimidation and acts of coercion, not to mention the ever-present credible death threats from the security force. Second, through the repeated jabbing of loaded guns, they were subjected to physical torture. Nevertheless, while the acts do reflect a streak of cruelty, and were most certainly frightening, the events that transpired were essentially an eight-hour aggravated assault and not the form of torture contemplated by norms of international law. *See* S. Exec. Rep. No. 101–30, at 14 (1990)("The term 'torture,' in the United States and

international usage, is usually reserved for extreme, deliberate and unusually cruel practices, for example, sustained systematic beating, application of electric currents to sensitive parts of the body, and tying up or hanging in positions that cause extreme pain.").

Moreover, Plaintiffs' attempts to paint the alleged conduct as fitting within the statutory definition of torture under the TVPA likewise fail. The TVPA provides that "[a]n individual who, under actual or apparent authority, or color of law, of any foreign nation subjects an individual to torture shall, in a civil action, be liable for damages to that individual." 28 U.S.C. § 1350, note § 2(a)(1). The TVPA defines "torture" as "any act, directed against an individual in the offender's custody or physical control by which severe pain or suffering ... whether physical or mental, is intentionally inflicted on that individual for such purposes as obtaining from that individual or a third person information or a confession ... intimidating or coercing that individual." 28 U.S.C., note § 3(b)(1). "Mental pain or suffering" refers to "prolonged mental harm cause by or resulting from the intentional infliction or threatened infliction of severe physical pain or suffering ... [or] by the threat of imminent death." 28 U.S.C. § 1350, note § 3(b)(2). Here, there is simply no allegation that Plaintiffs have suffered any prolonged mental harm or physical injury as a result of their alleged intimidation. Moreover, there are no direct allegations that Plaintiffs actually suffered any serious physical *injury to their persons*—just that they were exposed to a harrowing set of conditions. Coupled with the fact that the entire ordeal lacks the concentrated severity that characterizes other acts of actionable torture, this conduct cannot come within the scope of the TVPA's prohibitions.

While the Plaintiffs protest the Defendants' arguments as callous indifference, this Court is not bound to accept the Plaintiffs' labels for the alleged misconduct. *See Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir.1999) ("we are not required to accept as true the legal conclusions set forth in a plaintiff's complaint"). Moreover, cases construing the scope of the ATCA and TVPA demonstrate that ordinary torts—even those intentionally inflicted out of malice—are insufficient to permit federal jurisdiction. *See, e.g., Eastman Kodak Co.*, 978 F.Supp. at 1092 (S.D.Fla.1997) (noting that "merely because a particular provision of an international convention forbids a particular sort of conduct does not make that conduct a violation of the law of nations cognizable under the ATCA."). The instant case involves a situation where there are not allegations of any repeated beatings, physical torture, inhumane or prolonged imprisonment, or any identifiable physical injury. The allegations of torture during the eight-hour ordeal, while inappropriate and regrettable, simply do not rise to the level of "shockingly egregious violations of universally recognized principles of international law." *Zapata v. Quinn*, 707 F.2d 691 (2d Cir.1983). Therefore, the Court cannot allow the torture claims to proceed as the ATCA does not reserve jurisdiction for these claims.[5]

### 3. Unlawful Detention

■ Plaintiffs assert that their detention, against their will, during the October 13th events constitutes a violation of the international prohibition against arbitrary detention. *See Alvarez–Machain*, 331 F.3d 604, 620 (9th Cir.2003), *cert. grant-* ed, — U.S. —, 124 S.Ct. 821, 157 L.Ed.2d 692 (2003) ("[t]here exists a clear and universally recognized norm prohibiting arbitrary arrest and detention"). This norm has been recognized by other courts and in virtually all comprehensive international instruments. *See, e.g., Universal Declaration of Human Rights*, G.A. Res. 217A (III), Doc. A/810 at 71 (1948); *International Convention on Civil and Political Rights*, 999 U.N.T.S. 171, ratified by the United States on June 8, 1992, at Article 9(1). For example, in *Abebe–Jira v. Negewo*, 72 F.3d 844 (11th Cir.1996), the Eleventh Circuit affirmed the district court's finding that a claim for prolonged arbitrary detention by women imprisoned for three to ten months by leaders of governing units was actionable under the ATCA.

Defendants first contest the scope of the international prohibition. They argue that the law of nations does not recognize a *generalized* international norm against arbitrary detention, *see* Carter Decl., ¶¶ 68–75, but concede that over time, a very narrow and specific conduct involving state-sponsored prolonged arbitrary detention has coalesced into international law. Specifically, "[a] state violates international law, if, as a matter of state policy, it practices, encourages, or condones ... prolonged arbitrary detention." *Restatement (Third) of the Foreign Relations Law of the United States* § 702 (1987). Defendants argue that, contrary to Plaintiff's assertions, the length of detention appears to be an important factor that courts consider when assessing whether a violation has occurred. *See Mehinovic*,

---

**5.** Plaintiffs have raised a claim at oral argument that Defendants' conduct violates the international prohibition against cruel, inhuman, or degrading treatment. *See Abebe–Jiri v. Negewo*, 1993 WL 814304. (N.D.Ga.), *aff'd*, 72 F.3d 844 (11th Cir.1996). This claim, however, was not alleged in the TAC. Although Defendants make a strong argument that the facts alleged in the TAC do not rise to the level of a violation of international law, the Court does not reach this issue.

198 F.Supp.2d at 1349 (finding actionable under the ATCA claims where plaintiffs were detained for periods ranging from several days to two years). Defendants further argue that Plaintiffs' allegations of the 8–hour detention do not rise to the level of international prohibitions. Plaintiffs contend, however, that the norm against arbitrary detention does not contain a temporal element, that is, the length of time spent in detention. They cite *Alvarez–Machain v. United States*, a recent decision in the Ninth Circuit, where the Court states that the norm against arbitrary detention does not include a temporal element. 331 F.3d 604, 621 (9th Cir. 2003).

The Court does not pass judgment today in the abstract as to whether international law requires a temporal element. Nevertheless, there is often some egregious quality to the action that must be present for the conduct to be a violation of international law cognizable under the ATCA. *See Eastman Kodak*, 978 F.Supp. at 1078. Here, the disputed issue is whether the conduct as alleged rises to a violation of international law. Plaintiffs cite cases they deem to be analogous where time of detention was similar to the case at hand. *See, e.g. Paul v. Avril*, 901 F.Supp. 330, 335 (S.D.Fla.1994) (less than 10 hours); *Xuncax v. Gramajo*, 886 F.Supp. 162, 174–75 (D.Mass.1995) (less than a day). Nevertheless, they are distinguishable, as they involved detentions that featured egregious instances of torture, involving electric shocks in *Avril*, and over 100 cigarette burns in *Xuncax*. Further, plaintiffs in other cases have generally been detained in physically harrowing conditions of imprisonment. *See Eastman Kodak*, 978 F.Supp. at 1094. Finally, the eight-hour detention of the Plaintiffs by a non-governmental security force at their own headquarters is distinguishable from the filthy conditions of incarceration that Judge Ryskamp found marginally sufficient in a case where the conduct in question also gave the court pause. *See id.*

What the Plaintiffs ask the Court to do is to find that an eight-hour kidnapping by a shadowy "security force", accompanied by threats of death, is actionable under the ATCA. Yet, this Court's review of other ATCA cases confirms that the added quality of egregiousness is what confers subject matter jurisdiction under the ATCA. Despite Plaintiffs best efforts at characterizing the October 13th events, the essential facts as alleged do not rise to a level of conduct actionable under the ATCA. This case, in effect, represents the outer bounds of what character of conduct might constitute a violation of the international norm against arbitrary detention. Again, the Court finds that the specific allegations do not adequately state a violation of international law that is actionable under the ATCA.[6] While Plaintiffs suffered humiliation and fear when they were detained, that alone does not bring it within the ambit of the ATCA.

#### 4. Right to Organize and Associate

█ Plaintiffs assert that Defendants' participation in the October 13th events in Morales Izabal have deprived them of their "fundamental rights to associate and organize." TAC ¶ 75. Defendants contend, however, that the rights to associate and organize are not well-established, universally recognized norms of international law. They center their arguments on the lack of consistent state practice and the absence of any specific, definable norm of

---

**6.** While Plaintiffs allege a claim of kidnapping in the Third Amended Complaint, they do not expressly dispute Defendants' position that kidnapping has coalesced into international law, and instead contend that it is encompassed within the tort of arbitrary detention.

conduct that would violate the fundamental right to associate and organize.

Defendants first argue that Plaintiffs ignore the lack of any consistent practice regarding the alleged right to organize and associate. They cite the opposition or at least creation of severe obstacles to any right to organize and associate by a wide variety of countries, including China, Brazil, Egypt, and Russia. *See* Carter Decl. ¶¶ 41–42. They claim that this lack of consistent state practice demonstrates the lack of universal consensus on the issue. Plaintiffs, however, correctly point out that a state's conviction that the practice is required by law, or *opinio juris,* is the critical second element in finding that the freedom of association has ripened into customary international law. They assert that no country has expressly disputed that the norm exists, citing as an example the aftermath the Tiananmen Square events in China, where in its response to an ILO complaint, the Chinese government did not contest that it was obligated to support freedom of association—rather, it denied the specific acts as charged. *See* O'Leary Decl. ¶ 19. Therefore, state violations of the right to organize and associate are not *per se* evidence of the lack of international norm on the subject. However, the Court notes that for purposes of the ATCA, Plaintiffs must rely on stronger evidence than assumptions based on the absence of a country's explicit protestations regarding the existence of a fundamental right to associate and organize.

Second, and more persuasively, Defendants argue that reliance on a variety of treaties and non-binding declarations is misplaced in this case, since these are merely abstract rights and liberties concerning the right to freely associate and organize. Plaintiffs maintain that the rights to associate and organize are re-

flected in the *International Covenant for Civil and Political Rights* ("ICCPR"), the *United Nations Universal Declaration of Human Rights,* and Conventions 87 and 89 adopted by the International Labour Organization ("ILO"). Article 22 of the ICCPR includes the following language: "Everyone shall have the right to freedom of association with others, including the right to form and join trade unions for the protection of his interest." *International Convention on Civil and Political Rights,* opened for signature Dec. 19, 1966, 6 I.L.M. 368. Further, the ILO Conventions 87 and 98[7] also refer to the freedom of association and to organize and the right to organize. O'Leary Decl. ¶ 9. ILO Convention 87 provides that "workers and employers, without distinction whatsoever, shall have the right to establish, and subject only to the rules of the organization concerned, to join organizations of their own choosing without previous authorization." *See* Article 2. ILO Convention 98 provides a right to collectively organize. Plaintiffs therefore counter that the profusion of these treaties and conventions demonstrates that the freedom to associate is universal and obligatory.

The Court notes that these treaties and conventions are only evidence of international law and do not provide a basis for development of a customary norm of international law that is actionable under the ATCA. *See* Carter Decl. ¶ 45. Moreover, to mechanically find that they constitute binding international obligations is also premature. Plaintiffs heavily rely on the twin ILO Conventions in attempting to demonstrate that the core right, to establish and join an organization of one's choosing, is universally recognized. Close inspection of their provisions, however, does not provide solid support for Plain-

---

7. The United States has not ratified these Conventions.

tiffs' claimed universal rights. Both ILO Conventions contain clear limiting language that state "this Convention shall be binding only upon those Members of the International Labour Organization whose ratifications have been registered with the [ILO]." ILO No. 87, Art. 15; ILO No. 98, Art. 8. Additionally, acceptance of those documents is hardly unanimous, as roughly less than one-third of the ILO signatory countries have ratified the conventions. *See* Carter Decl. ¶ 45. Therefore, these Declarations hardly provide a firm basis for declaring a universal obligation of customary international law for the right to associate and organize.

Third, and most importantly, the critical inquiry for the purposes of the ATCA is whether a specific, definable prohibition can be pinpointed. Plaintiffs have not provided any indication of what specifically identifiable conduct constitutes a violation of this alleged norm. The language of the specific rights to associate in ICCPR for example contains little direction as to the specific conduct that would be in violation of its terms. Identifying a specific and definable norm is the meat and potatoes of an alleged ATCA violation, and without any legal guidance, the absence of specificity demonstrates further that the alleged norm has no legally discernable shape. *See Eastman Kodak*, 978 F.Supp. at 1092 ("[M]erely because a particular provision of an international convention forbids a particular sort of conduct does not make that conduct a violation of international law).

This Court is not duty-bound to accept Plaintiffs' formulations of international law. For example, courts have routinely dismissed claims of corporate involvement in environmental pollution in other ATCA cases. *See, e.g., Flores*, 343 F.3d 140 (affirming dismissal of personal injury action under the ATCA that alleged environmen-

tal pollution as violations of the "international right to life", "right to health," and "right to sustainable development"); *Beanal*, 197 F.3d at 168 (finding that cultural genocide was not actionable as a discrete violation of international law). The decisions underscore that courts must dismiss claims based on aspirational normative concepts, rather than specific and definable conduct. In *Flores*, the Second Circuit held that the rights to life and health contained in various international instruments were insufficiently definite to constitute rules of customary international law. *Flores*, 343 F.3d at 161. Similarly, in *Beanal*, the Court rejected plaintiff's attempt to recover under the ATCA for damage to the environment and a specific habitat resulting from defendants' mining activity that allegedly violated international law based on the "general sense of environmental responsibility, "the right to enjoy culture," and "the right to cultural development." *Beanal*, 197 F.3d at 163, 166–69 ("it would be imprudent for a United States tribunal to declare an amorphous cause of action under international law that has failed to garner universal acceptance").

Moreover, abridgement of rights similar to the right to associate and organize, like the freedom of speech, has been found not to constitute a violation of the "law of nations." *See, e.g., Guinto v. Marcos*, 654 F.Supp. 276, 280 (S.D.Cal.1986) (granting motion to dismiss for lack of subject matter jurisdiction under ATCA because, among other reasons, violation of First Amendment Right of Free Speech does not rise to level of universally recognized right); *DeWit v. KLM Royal Dutch Airlines, N.V.*, 570 F.Supp. 613, 618 (S.D.N.Y. 1983) (no subject matter jurisdiction under ATCA for constitutional violations under the First, Ninth, and Fourteenth Amendments of the U.S. Constitution).

When pressed to define the norm, Plaintiffs argue that only some violations of the freedom to associate would be actionable under the ATCA, and then simply offer the conclusion the facts here do rise to that level. Second, they claim that the fact that countries cannot be bound by an un-ratified treaty is of no moment in this analysis, since Plaintiffs' citation to the profusion of treaties is meant to demonstrate a universal commitment to prevent the violation of the particular norm. Yet, Plaintiffs still do not explain how to actually achieve the "rights to associate and organize"—and most importantly, "what conduct falls within or outside the law." *Flores*, 343 F.3d at 161. Further, they improperly rely on conclusory inferences of *opinion juris* based on a country's lack of affirmatively objecting to a norm of customary international law as evidence of this supposed universal obligation. Still, this Court cannot dismiss the deduction that even if the October 13th events were calculated to prevent the Plaintiffs from engaging in their right to organize and collectively bargain, well-established, universal norms of customary international law might not specifically prohibit it.

Finally, while the Court notes that a recent opinion in a neighboring district court has recognized that the right to associate is actionable under the ATCA, it must depart from its reasoning on this issue. *Estate of Lacarno Rodriquez v. Drummond*, 256 F.Supp.2d 1250 (N.D.Ala. 2003) (relying on ILO Conventions 87 and 88 and ICCPR Article 22 in "reluctantly" finding that right to associate and organize are actionable torts under the ATCA). The court voiced caution in finding that the right to associate was actionable *at a preliminary stage of the proceedings. Id.* (emphasis added). Further, the decisions did not grapple with the essential amorphous nature of this right and attempt to define what conduct falls afoul of these

claimed rights. Therefore, this Court declines to adopt the *Drummond* court's reasoning.

The characteristics of customary international law are often open to "creative interpretation," and this Court must progress with extraordinary care and restraint. *See Flores*, 343 F.3d at 154. Therefore, although this decision is not straightforward, for the foregoing reasons, this Court cannot let this claim proceed as Plaintiffs have not established the existence of customary international law "right to associate and organize." While Plaintiffs claim not to advocate that U.S. courts should be the forum for all labor disputes worldwide, it is hard to imagine what claims of violations of the fundamental right to associate and organize would *not* be heard under the ATCA if this Court allowed the claims to proceed.

### 5. Crimes Against Humanity

■ Crimes against humanity have been recognized as violation of customary international law since the Nuremberg Trials in 1944. *See, e.g., Estate of Cabello v. Fernandez–Larios*, 157 F.Supp.2d 1345, 1360 (finding that "the ruling of the Nuremberg Tribunal memorialized the recognition of crimes against humanity as customary international law"). The Charter of the International Military Tribunal at Nuremberg, among other things, defined crimes against humanity, as "murder, enslavement, deportation, and other inhumane acts committed against any civilian population, before or during the war, or persecutions on political, racial, or religious grounds in execution of, or in connection with, any crime within the jurisdiction of the Tribunal, whether or not in violation of the domestic law of the country where perpetrated." *Charter of the International Military Tribunal*, Aug. 8, 1945, art. 6(c), 82 U.N.T'.S. 284. Generally, a

crime of humanity must be perpetrated as part of a widespread or systematic attack against a civilian population. *See Rome Statute of the International Criminal Court*, July 17, 1998, art. 7, U.N. Doc. A/CONF. 183/9. *See also, Wiwa v. Royal Dutch Petroleum Co.*, 2002 WL 319887, at *10 (S.D.N.Y. Feb.28, 2002).

Although the parties dispute whether a link between the alleged crimes and armed conflict is necessary, the violations alleged by Plaintiffs clearly do not constitute a "crime against humanity." As a preliminary matter, Plaintiffs acknowledge that the definition of crimes against humanity is "not entirely settled." Pl. Suppl. Br. at 19. They attempt in vain to link the October 13th events to a long pattern Guatemalan internal strife regarding labor unionists, specifically since the coup of Guatemalan President Jacobo Arbenz in 1954. They cite to a number of UN documents and U.S. State Department Reports on Guatemala in attempting to show a pattern of state-sanctioned attacks on a discrete class of persons—the labor unionists. Pl. Suppl. Br. at 20–23.

Defendants strongly dispute that the alleged conduct even approaches a "crime against humanity" since this is reserved for the most egregious violations of international law, such as genocide and slavery. Most ATCA cases have determined liability for "crimes against humanity" only for the most heinous of crimes, such as murder and extermination, slavery, ethnic cleansing, and torture, which are undertaken as part of a widespread or systematic attack against a civilian population. *See, e.g. Sarei v. Rio Tinto*, 221 F.Supp.2d 1116, 1126–51 (C.D.Cal.2002) (finding that allegations of Papua New Guinea's government-imposed blockade which prevented medicine, clothing, and other essential supplies from reaching the people of the island of Bougainville and which resulted in more than 10,000 deaths over seven years, stated a claim for crimes against humanity under the ATCA); *Mehinovic v. Vuckovic*, 198 F.Supp.2d 1322 (N.D.Ga.2002) (finding judgment for crimes against humanity against former Bosnian Serb Police officer based on various acts of brutality against Muslim plaintiffs during the Bosnian ethnic cleansing campaign); *Wiwa v. Royal Dutch Petroleum Co.*, 2002 WL 319887, at *10 (S.D.N.Y.2002) (finding that allegations of deportation or forced exile and torture against the Ogoni people in Nigeria, as part of a widespread attack, stated a claim for crimes against humanity under the ATCA).

Moreover, there is simply no "widespread or systematic attack" against a civilian population in this case. Widespread is defined as a "frequent, large-scale action carried out collectively with considerable seriousness and directed against a multiplicity of victims." Carter Decl. ¶ 63 (quoting *Prosecutor v. Akayesu*, ICTR, case No. ICTR–96–4–T, Judgment of Sept. 2, 1998, at ¶ 580). Systematic is defined as "thoroughly organized action, following a regular pattern of the basis of a common policy and involving substantial public or private resources... [T]here must be some preconceived policy or plan." *Id.* Despite Plaintiffs' citation to a litany of reports by NGOS and international organizations, the October 13th events are simply too far attenuated from this backdrop. Second, the pattern of violence was directed at large swathes of the Guatemalan people—including scholars, students, human rights workers and judges. Pl. Suppl. Br. at 22–23. There is no isolated campaign against trade unionists. At best, the October 13th events represent an injustice to the labor unionists—however, to link it to a widespread, systematic plan or policy is simply too attenuated to be actionable under the ATCA and therefore this claim must fail.

## B. PRESENCE OF STATE ACTION

 Sufficiently alleging that defendant's conduct is under the color of official authority is a crucial component of a claim under the ATCA and TVPA. While international law does not require state action for certain violations such as genocide and piracy, Plaintiffs have conceded that there must be state action for the claims asserted in their Third Amended Complaint. *See In re Estate of Ferdinand E. Marcos Human Rights Litigation*, 978 F.2d 493, 501–02 (9th Cir.1992). Mere conclusory allegations regarding state action cannot satisfy a plaintiff's burden under the ATCA. *See Beanal v. Freeport–McMoran, Inc.*, 197 F.3d 161, 165–169 (5th Cir.1999) (affirming dismissal of complaint asserting claims under the ATCA and TVPA for lack of specificity).

Typically, in ATCA actions against non-state actors such as Defendant corporations, courts look to the "color of law" jurisprudence of 42 U.S.C. § 1983 as a relevant guide to whether a private defendant is engaged in official action for the purposes of ATCA. *See Bigio v. Coca–Cola Co.*, 239 F.3d 440, 448 (2nd Cir.2000); *Kadic*, 70 F.3d at 243. "A private individual acts under color of law within the meaning of Section 1983 when he acts together with state officials or with significant state aid." *Kadic*, 70 F.3d at 245. According to the Third Amended Complaint, Defendants hired or otherwise created an agency relationship with an armed and organized security force to use violence and intimidate the SITRABI leadership in order to affect the outcome of the ongoing collective bargaining negotiations and associated labor disputes concerning the workforce at the Bobos Plantation. TAC ¶ 28.

 This case presents a somewhat unusual issue of state action in the ATCA context. In most cases filed against corporations, the corporation is accused of complicity in what are clearly actions taken by state entities. *See Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 244 F.Supp.2d 289 (S.D.N.Y.2003). Here, the issue is somewhat confusing, as both the official conduct component to properly ascribe state action and the actual participation of the corporate Defendants is unclear. The October 13th events were carried out by unruly gang, but whether their conduct can be properly imputed to either the State or the Defendants is an issue that is clarified below. Accordingly, the Court first turns to whether there is official conduct that creates state action in the first place. Second, the Court considers whether the corporate Defendants can be found liable under the joint action variant of the "color of law" jurisprudence.

### a. Official Conduct

Before private conduct can be found to constitute state action, however, it is necessary to determine whether direct involvement of the Guatemalan government or its employees and agents exists in the first place with regard to the October 13th events. To properly allege state action, the events of October 13th must be attributable to the state, or in other words, it must be official conduct. *See Beanal*, 969 F.Supp. 362 (E.D.La.1997), *aff'd*, 197 F.3d 161 (5th Cir.1999) (citing Restatement of Foreign Relations, § 207 comment c). A state is responsible for any violation of its obligations under international law resulting from action or inaction by "any organ, official, employee, or other agent of a government or of any political subdivision, acting within the scope of authority or under color of such authority." *Id.*

Defendants contend that Plaintiffs' allegations of state action are insufficient to sustain liability because the actions cannot

be properly ascribed to state actors. Plaintiffs allege that civic and business leaders conspired with selected Del Monte officials to hatch a plan to destroy the Union on October 13th and 14th. The TAC alleges a three-step series of events in which state action is claimed. Plaintiffs claim that the Defendants were private actors who aided and abetted state actors in perpetrating the October 13th events. First, Del Monte entities gathered together civic and business leaders and warned that closure of the Bobos plantation was inevitable if the labor strikes were not stopped. *See* TAC ¶¶ 28, 30–33, 40–44. Next, the business leaders plus a few Del Monte employees entered into a specific agreement of how to deal with the union leaders. Finally, the alleged conspiracy was then implemented, as the SITRABI leaders were rounded up. They allege that municipal leaders such as the Mayor and future Mayor of Morales, the President of the Morales Chamber of Commerce and several prominent businessmen were present at some point during the day's events. As the events transpired, the future Mayor of Morales at some point told the unruly mob to stand down. TAC ¶¶ 44, 47. Moreover, public officials intentionally failed to take action in order to permit the violence to occur. *Id.* Guatemalan law apparently sanctions the creation and use of private, armed security forces. *Id.*

Without more factual context, however, such as more detail regarding the state actor's participatory acts, whether they were acting within the scope of their authority or how they assisted Defendants, state action itself cannot be discerned in this case. *See Beanal,* 969 F.Supp. at 379 ("The Complaint merely alleges an Indonesia military presence and obliquely refers to the participation of 'third parties' who aided [defendant] in the challenged conduct. The court finds that these allega-

tions fail to make out a claim for state action ..."). Moreover, beyond their conclusory allegations of complicity, beyond a few sparse references to the presence of undefined "public officials" at certain meetings and events, there is no other detail that is generally required to find state action. *See Dwares v. New York,* 985 F.2d 94 (2d Cir.1993) (internal citation omitted) (allegations of conspiracy under § 1983 require "details of time and place and the alleged effect of the conspiracy").

Close inspection of the allegations also reveals that Plaintiffs rely on conclusory allegations of causality in order to buttress their claim. Even when all favorable inferences are given, it would not necessarily implicate state action solely because of the presence of a few officials. Plaintiffs have alleged nowhere in the Third Amended Complaint that the alleged torture was perpetrated or actively condoned by the Guatemalan government or its agents or representatives. *See Drummond,* 256 F.Supp.2d 1250, 1261 (finding sufficient state action alleged where paramilitaries that murdered union leaders were dressed in Colombian military uniforms and were members of the military). Moreover, the perpetrators of the alleged torture—the so-called "security force"—are not alleged to be state instrumentalities themselves. They are not even identified besides being a mob of local citizens, and further, the alleged state actors are only described as "public officials" or "civic leaders." *See* TAC ¶ 29. In most ATCA cases, the military, police, or paramilitaries actually commit the violence, whereas here, it is at best a group of Izabal citizens and local business leaders with a few references to undefined civic leaders sprinkled in for good measure.

▇▇ Second, the fact that Guatemala has laws permitting private security forces

does not by itself create state action whenever the security force acts. Plaintiffs claim that this law was a precondition for the Bobos events. If legislation allowing private security companies to engage in business constitutes "state action" then every claim against a security company would create § 1983 liability. *See, e.g.* Carter Decl. ¶ 82 (citing Article 8 of International Law Commission's Draft Articles on State Responsibility (2001)) (state action can be found for conduct when actors are "in *fact acting on the instructions of, or under the direction or control of, that State in carrying out the conduct*") (emphasis added). Moreover, this is not the case where paramilitary groups roam rampantly through the countryside. *See Sinaltrainal v. Coca–Cola Co.*, 256 F.Supp.2d 1345, 1357 (S.D.Fla.2003) (finding that state action existed where paramilitaries were alleged to function openly in Colombia and had continuing support from military and local police).

▬ Third, a failure to enforce a law is not a basis for state action. It is well-established that "mere acquiescence of a state official in the actions of a private party is not sufficient to establish state action." *Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442, 1453 (10th Cir.1995); *accord Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 164, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978) (holding certain activities were not properly attributable to the State for purposes of establishing "state action" under the Fourteenth Amendment because a State's mere acquiescence in a private action does not create state action); *McKeesport Hosp. v. Accreditation Council for Graduate Medical Education*, 24 F.3d 519, 524 (3d Cir.1994) (holding presence of government agent as observer was insufficient state action to support hospital's § 1983 due process claim). Furthermore, "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause," even when state actors "stood by and did nothing when suspicious circumstances dictated a more active role for them." *DeShaney v. Winnebago*, 489 U.S. 189, 197, 203, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). The simple fact of the presence of the Mayor of Izabal at certain times during the October 13th incident is insufficient to find the necessary degree of participation or nexus without more allegations about the nature of his assistance or whether he was acting in his official capacity. Further, there is no indication that the Mayor of Izabal planned or authorized the events.

Plaintiffs counter that under well-worn § 1983 jurisprudence, state action can be found if they prove that the National Police intentionally refused to intervene as the October 13th gang allegedly tortured the Plaintiffs or failed to take enforcement action thereby allowing the wrongful acts to have their desired impact. *See, e.g., Griffin v. City of Opa–Locka*, 261 F.3d 1295, 1311 (11th Cir.2001); *Depew v. City of St. Marys*, 787 F.2d 1496, 1499 (11th Cir.1986). This rationale is flawed. The cases they cite are not analogous since they involve the requisite proof of custom necessary for municipal liability and not joint action. Moreover, there is no allegation that Defendants themselves directed the National Police not to intervene nor is there alleged links between the Defendants and any state actor who gave the non-interference command. Nor is there any indication of what the actors may have done, whether they were acting within the scope of their authority, and how they may have assisted Defendants. The chain of causation that Plaintiffs posit—the alleged general threat by Defendants that "something had to be done about SITRABI" at being a precipitating event for the ensuing events of October 13th is also insufficient

to find state liability-for acts mostly done by third parties, such as local business leaders. *See United States v. Iran,* 1980 I.C.J. 3, 29–30 (May 24, 1980) (Ayatollah Khomeini's general public declaration inveighing against the United States and congratulatory phone call to student militants after embassy seizure not sufficient to link the students' seizure of the U.S. embassy with "any competent organ of the Iranian state."). Therefore, the Court finds that there is no predicate state action for potential "joint action" between the government and the security force or Defendants.

### b. Joint Action under Color of Law

Even assuming, *arguendo,* that Plaintiffs sufficiently alleged state action, they must still show that Defendants participated in the alleged violations of international law by acting together with the state officials to sustain their claims. Again, Plaintiffs have provided a murky group of facts that are wholly insufficient as a matter of law to hold Defendants responsible under prevailing legal standards.

The Supreme Court has articulated four tests to determine whether private conduct constitutes state action: (1) the "nexus test"; (2) the "symbiotic relationship test"; (3) the "joint action test"; and (4) the "public function test." *See Brentwood Academy v. Tennessee Secondary School Athletic Assoc.,* 531 U.S. 288, 296, 121 S.Ct. 924, 148 L.Ed.2d 807 (2001). Plaintiffs allege that participation of state civil officials in the wrongful acts along with the cooperation of state officials satisfies any requirement of state action. *See* TAC ¶ 66 ("the acts described herein are actionable under the ATCA, and if such a showing is required, were done with the complicity of state actors. In acting together with its agent, the security force [was] permitted

to exist and openly operated under the laws of Guatemala, and assisted by government officials of the Bobos District").

Plaintiffs claim that Defendants can be held liable as de facto state actors under the "joint action test." [8] Joint action exists where private persons are "jointly engaged with state officials in the challenged action." *Dennis v. Sparks,* 449 U.S. 24, 27–28, 101 S.Ct. 183, 66 L.Ed.2d 185 (1980) (*citing Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 152, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)). Traditionally, either a conspiracy or "willful participation" with the state actor will satisfy the "joint action" test. *National Coalition Gov't of the Union of Burma v. Unocal,* 176 F.R.D. 329, 346 (C.D.Cal.1997) (*citing Collins v. Womancare,* 878 F.2d 1145, 1150 (9th Cir. 1989)). Moreover, the *Wiwa* court recently clarified that allegations of a "substantial degree of cooperative action between the state and private actors" also establishes joint action. *Wiwa,* 2002 WL 319887, at *13.

Plaintiffs' bare allegations of state action make it unclear whether Defendants can be held liable under *any* "color of law" analysis. Plaintiffs position two management employees of Bandegua at the meeting where the conspiracy to put down the SITRABI union was allegedly hatched and then argue that their involvement throughout the day's events is sufficient to find the joint action necessary. Plaintiffs also contend that Del Monte entities gathered together civic and business leaders and warned that closure of the Bobos plantation was inevitable if the labor strikes were not stopped. *See* TAC ¶¶ 28, 30–33, 40–44. Yet, this is insufficient to establish causality, and there are scarcely any other legally acceptable allegations of joint action. As noted above, the TAC fails to state any

---

**8.** The parties do not dispute that private corporations can be held liable under the ATCA.

facts beyond the mere presence of undefined public officials at the conspiracy meetings and the appearance of the Mayor of Izabal during the evening.

Plaintiffs, however, contend that other courts have found such allegations of conspiracy are sufficient to find joint action. *See, e.g., Steelworkers v. Phelps Dodge Corp.*, 865 F.2d 1539, 1545 (9th Cir.1988) (en banc), *cert. denied*, 493 U.S. 809, 110 S.Ct. 51, 107 L.Ed.2d 20 (1989) (finding joint action established by common mission between private employer and local law enforcement officers to violate striker's rights); *Eastman Kodak*, 978 F.Supp. at 1091 (conspiracy with Bolivian state judicial actors to keep Plaintiff in detention to extract a settlement). However, the cases are distinguishable. The allegations in *Eastman Kodak* involved more than a "personal vendetta by purely private persons." *Id.* at 1092. The contours of a clear conspiracy between a private individual and a judicial officer were outlined, with the end result of the local judge ordering plaintiff to be detailed in "miserable and life-threatening conditions until a settlement could be extorted." *Id.* In other words, the complaint contained allegations that, if proven, would be considered a conspiracy for the purposes of state action. Moreover, other ATCA cases where *de facto* liability was found were characterized by formalized relations between state entities and private corporations. *See, e.g., Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 244 F.Supp.2d 289, 328 (S.D.N.Y.2003) (commercial relations between corporation and Government, and knowledge that payments for protection included unlawful acts); *Iwanowa v. Ford Motor Co.*, 67 F.Supp.2d 424 (D.N.J.1999) (utilization of forced labor in accordance with Nazi directives to produce war material and increase production); *Doe v. Unocal*, 963 F.Supp. 880 (C.D.Cal.1997) (formal agreement between corporation and government with respect to gas pipeline project).

Finally, Plaintiffs attempt to defer a determination of whether state action exists to the summary judgment stage, arguing that it is a fact-laden inquiry. *See Drummond*, 256 F.Supp.2d 1250, 1262 n. 6. Under most circumstances, that would be the case. However, a Plaintiff cannot simply rely on conclusory allegations of joint action that that are inadequate to create sufficient state action. *See Bao Ge v. Li Peng*, 201 F.Supp.2d 14 (D.D.C.2000) (granting motion to dismiss ACTA claims against private corporation based on insufficient allegations of joint action under color of law).

## C. TORTURE VICTIMS PROTECTION ACT (COUNT II)

Although the TVPA creates a private cause of action for torture perpetrated by individuals acting under the color of law of any foreign nation, it does not confer jurisdiction standing alone.[9] Claims for torture may be entertained only if they fall within the jurisdiction conferred by the ATCA *Abebe–Jira v. Negewo*, 72 F.3d 844, 848 (11th Cir.1996); *Kadic*, 70 F.3d at 246. As the Court has found that Defendants have not properly pled a violation of the international prohibition against torture, this claim must also be dismissed as it is

---

9. The TVPA provides, in relevant part, for a civil cause of action against an individual who, under color of law of any foreign nation, subjects another person to torture or extrajudicial killing. 18 U.S.C. § 1350, note, § 2(a). Torture is defined as any intentional act inflicting severe pain or suffering taken against an individual in the offender's custody or physical control for the purpose of obtaining information, punishment, or intimidation. *Id.* at § 3(b)(1).

now bereft of its substantive component. *See Sinaltrainal v. Coca–Cola Co.*, 256 F.Supp.2d 1345, 1357 (S.D.Fla.2003).

## D. RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT . (COUNT IV)

 Plaintiffs allege that the Del Monte Defendants engaged in a conspiracy to cause physical and mental harm to Plaintiffs in violation of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961 *et seq.* Compl. ¶ 2. "To establish a violation of the substantive RICO provision, 18 U.S.C. § 1962(c), the Eleventh Circuit has held it necessary to prove the following: (1) the existence of an enterprise; (2) that the enterprise affected interstate commerce; (3) that the defendants were employed by or associated with the enterprise; (4) that the defendants participated, either directly or indirectly, in the conduct of the affairs of the enterprise; and (5) that the defendants participated through a pattern of racketeering activity." *BankAtlantic v. Coast to Coast Contractors, Inc.*, 22 F.Supp.2d 1354, 1358 (S.D.Fla.1998). The Court finds that Plaintiffs have not properly pled these elements.

 Defendants assert that because the Third Amended Complaint is based almost entirely on events that occurred in Guatemala, this Court has no subject matter jurisdiction to consider the RICO claim. In determining whether RICO applies to extraterritorial acts, the allegations must meet either the "conduct" test or the "effect" test. *Sinaltrainal*, 256 F.Supp.2d at 1359 (quoting *North South Fin. Corp. v. Al–Turki*, 100 F.3d 1046 (2d Cir.1996)). Under the "conduct" test, a court may assert subject matter jurisdiction over a RICO claim only if conduct material to the alleged crime or directly causing the alleged loss occurred in the

United States. *See id.* Mere preparatory activities and conduct far removed from the completion of the wrongdoing are insufficient to confer subject matter jurisdiction.

Under the "effects" test, subject matter jurisdiction requires "substantial" effects which are a "direct and foreseeable result of the conduct outside the United States." *See Sinaltrainal*, 256 F.Supp.2d at 1359 (quoting *Consolidated Gold Fields*, 871 F.2d at 261–262). The test is met when the domestic effect is a "direct and foreseeable result of the conduct outside of the United States." *Id.* at 1359 (quoting *Consolidated Gold· Fields*, 871 F.2d at 261–262).

In a recent decision of this Court, the Honorable Jose A. Martinez held that allegations of RICO violations based upon attacks on labor union leaders in Colombia failed to allege conduct satisfying either the conduct or effects test necessary to establish jurisdiction within the United States. *See Sinaltrainal v. Coca–Cola Co.*, 256 F.Supp.2d 1345, 1359 (S.D.Fla.2003). The facts in this case, while different in scope and severity, are nevertheless analogous in the RICO-context, as the allegations here essentially concern preparatory activities for foreign conduct that do not have a substantial effect within the United States. *See id.* Moreover, even if the scheme was hatched in the United States, as Plaintiffs allege, the connection to Defendants' profits is tenuous at best. Accordingly, RICO subject matter jurisdiction does not exist in this case as a matter of law. Therefore, this claim is DISMISSED *with prejudice.*

## E. PLAINTIFFS' STATE LAW CLAIMS (COUNTS V–XII)

### 1. Diversity Jurisdiction (18 U.S.C. § 1332)

 Plaintiffs' also allege a litany of state common law claims. Defendants

contest the existence of diversity jurisdiction that would allow the Court to properly hear these claims. As an initial matter, for subject matter jurisdiction to be successfully premised on 18 U.S.C. § 1332, diversity of citizenship must be complete. *See Cabalceta v. Standard Fruit Co.,* 883 F.2d 1553, 1557 (11th Cir.1989) (citing *Strawbridge v. Curtiss,* 7 U.S. (3 Cranch) 267, 2 L.Ed. 435 (1806)). "Diversity of citizenship 'should be distinctly and positively averred in the pleadings, or should appear with equal distinctness in other parts of the record.'" *Buti v. Impressa Perosa, S.R.L.,* 935 F.Supp. 458, 461 (S.D.N.Y.1996), *aff'd,* 139 F.3d 98 (2d Cir. 1998), *cert. denied,* 525 U.S. 826, 119 S.Ct. 73, 142 L.Ed.2d 57 (1998) (citation omitted). The burden of proving that complete diversity exists rests upon the party seeking to invoke the Court's jurisdiction. *Leonard v. Kern,* 651 F.Supp. 263, 264 (S.D.Fla.1986).

 Defendants claim that Plaintiffs have failed to allege, and cannot demonstrate, that there is complete diversity of citizenship to permit subject matter jurisdiction under 28 U.S.C. § 1332. The Court agrees. Plaintiffs admit that they are citizens of Guatemala who now reside in the United States. *See* TAC §§ 6–12. Six of the Plaintiffs—Villeda, Guerra, McIntosh, Marel Martinez, G. Martinez and Hernandez—reside in California. Additionally, Plaintiff Palma resides in Nevada. Defendant Fresh Del Monte Produce is a Cayman Islands corporation, and Bandegua is a Guatemalan corporation. Thus, because the Plaintiffs are aliens suing two alien corporations, complete diversity does not exist. *See Corporacion Venezolana de Fomento v. Vintero Sales Corp.,* 629 F.2d 786, 790 (2d Cir.1980).

Plaintiffs argue, however, that § 1332 diversity jurisdiction is not defeated because they are "deemed" citizens of California and Nevada. All the Plaintiffs were granted asylum through the assistance of the U.S. Embassy and now are awaiting a final decision on permanent residency. The "deeming provision" of 28 U.S.C. § 1332(a) provides that "[f]or purposes of this section ... an alien admitted to the United States for permanent residence shall be deemed a citizen of the State in which such alien is domiciled."

This reliance is misplaced. First, the Eleventh Circuit has limited the deeming provision to only apply to aliens residing in the U.S. on a "permanent visa." *Foy v. Schantz, Schatzman & Aaronson, P.A.,* 108 F.3d 1347, 1349 (11th Cir.1997). Moreover, it is clear that persons admitted on non-immigrant or temporary work visas are not deemed citizens under § 1332. *See, e.g., Miller v. Thermarite Pty. Ltd.,* 793 F.Supp. 306, 308 (S.D.Ala.1992). Second, while Plaintiffs argue that the deeming provision was actually intended to eliminate the possibility of subject matter jurisdiction in cases between a citizen and an alien living in the same state, *Saadeh v. Farouki,* 107 F.3d 52, 60 (D.C.Cir.1997), they cannot escape the Eleventh Circuit's command that district courts only "refer to an alien litigant's official immigration status to determine if the alien was 'admitted to the United States for permanent residence.'" *Foy v. Schantz, Schatzman & Aaronson, P.A.,* 108 F.3d 1347, 1349 (11th Cir.1997). Further, the fact that the Plaintiffs are political asylees that have permanent residency applications pending is of no moment in the inquiry for diversity jurisdiction. *Aideyan v. Greaves,* 908 F.Supp. 196, 197 (S.D.N.Y.1995) (holding that political asylee is not person admitted to United States for permanent residence within the meaning of Section 1332(a)); *see also Chan v. Mui,* 1993 WL 427114, at * 1 (S.D.N.Y. Oct.20, 1993) (deeming provision

does not apply to alien with pending green card application).

Plaintiffs do not provide any allegation of permission from the relevant authorities to remain permanently in the United States. Moreover, the Court also notes that Plaintiffs' Asylum Approvals attached as exhibits expressly state that "asylum status does not give you the right to remain permanently in the United States." Pl.Ex. I. Accordingly, because complete diversity does not exist, the Court is not vested with subject matter jurisdiction over the remaining state law claims in the Complaint.[10]

### 2. Supplemental Jurisdiction (28 U.S.C. § 1367)

■ The Court has concluded that subject matter jurisdiction to consider Plaintiffs' ATCA, TVPA, and RICO claims and further, that diversity jurisdiction under 28 U.S.C. 1332 is not present. When all of the principal federal claims over which the Court may have had original jurisdiction have been dismissed, the decision whether to exercise supplemental jurisdiction over pendent non-federal claims is fully discretionary. 28 U.S.C. § 1367(c)(3). In *United ed Mine Workers of America v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), the Supreme Court advised that "if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." *Id.* at 726. Here, the proceedings are at an early state and there has been relatively no discovery. Therefore, in the exercise of its discretion, the Court declines to consider the pendent non-federal claims.

### IV. CONCLUSION

THIS CAUSE came before the Court upon Defendants' Consolidated Motion to Dismiss Third Amended Complaint for Lack of Subject Matter Jurisdiction and for Failure to State Claim Upon Which Relief Can Be Granted (D.E. No. 87), filed on *April 30, 2003.*

THE COURT has considered the motion, the responses, the supplemental briefs on international legal issues, affidavits, and the pertinent portions of the record, and being otherwise fully advised in the premises and in open court, it is

**ADJUDGED** that the motion to dismiss is GRANTED. Accordingly, the Plaintiffs' Third Amended Complaint is DISMISSED *without prejudice* consistent with the above opinion. Plaintiffs shall file an amended complaint no later than *January 15, 2004.*

---

**10.** The Court does not reach the issue of the application of Guatemalan or Florida law to the violations alleged in the Third Amended Complaint.